## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Scott Payne, individually and on behalf of all others similarly situated, | No. 0:24-cv-545-SRN-DTS |
| Plaintiff, | |
| vs. | **MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS THE COMPLAINT** |
| Hormel Foods Corp.; the Board of Directors of Hormel Foods Corp.; and John Does 1-40, | |
| Defendants. | |

## TABLE OF CONTENTS

INTRODUCTION ..........................................................................................................1

BACKGROUND............................................................................................................2

     I.      Hormel's Retirement Plans .........................................................2

     II.     The Challenged Plan Investment Options............................................3

          A.    The Plans' GIC ...........................................................3

          B.    The Harbor Fund ........................................................5

          C.    The DFA Fund .....................................................7

     III.    Payne's Claims.........................................................7

MOTION TO DISMISS STANDARD ..................................................................9

ARGUMENT .................................................................................................9

     I.      Payne must plausibly allege that Defendants had a flawed fiduciary process for monitoring the Plans' investments....................9

     II.     The GIC Claim does not plausibly suggest a flawed fiduciary process........................................................................11

          A.    Payne fails to allege that the Stable Value Comparators' "crediting rates" were available to the Plans ...........................13

          B.    Payne fails to allege that the Stable Value Comparators are "meaningful benchmarks," as required by the Eighth Circuit........................................................................15

               1.    Payne fails to allege whether the Stable Value Comparators have a similar guaranteed minimum return as the Plans' GIC .....................................17

               2.    Payne fails to allege whether the Stable Value Comparators have a similar crediting rate methodology as the Plans' GIC.......................19

3.  Payne fails to allege whether the Stable Value Comparators have similar liquidity as the Plans' GIC ........................................................... 19

4.  Payne admits the Stable Value Comparators have different risk profiles than the Plans' GIC .................... 19

5.  Payne fails to allege whether the Stable Value Comparators cost the same as the Plans' GIC .............. 21

6.  Payne fails to allege whether the Stable Value Comparators' underlying investments are similar to those in the Plans' GIC .................................................. 22

C.  The alleged "underperformance" does not plausibly suggest a flawed fiduciary process ............................................... 22

III.  The Share Class Claim fails to plausibly suggest a flawed fiduciary process ................................................................................................ 23

A.  Payne fails to allege that the Alternative DFA Fund was available to the Plans .................................................................... 24

B.  The Plans' share class of the Harbor Fund was net cheaper than the alternative share identified by Payne .......... 25

IV.  The Court should dismiss the Board of Directors ............................. 28

CONCLUSION ................................................................................................................. 29

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Albert v. Oshkosh Corp.,*
   47 F.4th 570 (7th Cir. 2022) .......................................................................... 6

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) ....................................................................................... 9

*Barchock v. CVS Health Corp.,*
   886 F.3d 43 (1st Cir. 2018) ..................................................................... 12, 23

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007) ................................................................................. 9, 29

*Boyette v. Montefiore Med. Ctr.,*
   No. 22-cv-5280, 2023 U.S. Dist. LEXIS 203442 (S.D.N.Y. Nov. 13,
   2023) .............................................................................................................. 24

*Braden v. Wal-Mart Stores, Inc.,*
   588 F.3d 585 (8th Cir. 2009) ................................................................... 11, 28

*Chi. Dist. Council of Carpenters Welfare Fund v. Caremark, Inc.,*
   474 F.3d 463 (7th Cir. 2007) .......................................................................... 9

*Dale v. NFP Corp.,*
   658 F. Supp. 3d 620 (N.D. Ill. 2023) ........................................................... 21

*Davis v. Wash. Univ. in St. Louis,*
   960 F.3d 478 (8th Cir. 2020) ................................................................*passim*

*Ellis v. Fid. Mgmt. Tr. Co.,*
   883 F.3d 1 (1st Cir. 2018) ............................................................................ 12

*England v. Denso Int'l Am., Inc.,*
   No. 22-11129, 2023 U.S. Dist. LEXIS 131386 (E.D. Mich. July 28,
   2023) .......................................................................................................... 20, 23

*Fifth Third Bancorp v. Dudenhoeffer,*
   573 U.S. 409 (2014) .......................................................................... 1, 10, 11

*Forman v. TriHealth, Inc.*,
    40 F.4th 443 (6th Cir. 2022) ............................................................................. 23, 27

*Fritton v. Taylor Corp.*,
    No. 22-cv-00415, 2022 U.S. Dist. LEXIS 222996 (D. Minn. Dec. 12,
    2022) ...................................................................................................... 15, 19, 22

*In re GSE Bonds Antitrust Litig.*,
    396 F. Supp. 3d 354 (S.D.N.Y. 2019) ........................................................................ 5

*Harmon v. FMC Corp.*,
    No. 16-6073, 2018 U.S. Dist. LEXIS 43222 (E.D. Pa. Mar. 16, 2018) ................... 20

*Hughes v. Nw. Univ.*,
    142 S. Ct. 737 (2022) .................................................................................... 10, 23

*Hughes v. Nw. Univ.*,
    63 F.4th 615 (7th Cir. 2023) .................................................................................. 24

*Johnson v. Parker-Hannifin*,
    No. 1:21-cv-00256, 2023 U.S. Dist. LEXIS 214747 (N.D. Ohio Dec.
    4, 2023) .................................................................................................................. 24

*Keller v. North Memorial Health Care*,
    No. 22-cv-1794-JWB-JFD (D. Minn. Mar. 6, 2023) ............................................... 28

*Laabs v. Faith Techs., Inc.*,
    No. 20-CV-1534, 2023 U.S. Dist. LEXIS 233547 (E.D. Wis. Aug. 30,
    2023) ..........................................................................................................*passim*

*Lalonde v. Mass. Mut. Ins. Co.*,
    No. 22-30147, 2024 U.S. Dist. LEXIS 57670 (D. Mass. Mar. 29,
    2024) ..........................................................................................................*passim*

*Larson v. Allina Health Sys.*,
    350 F. Supp. 3d 780 (D. Minn. 2018) ..................................................................... 24

*Lucas v. MGM Resorts Int'l*,
    No. 2:20-cv-01750, 2024 U.S. Dist. LEXIS 49215 (D. Nev. Mar. 19,
    2024) ........................................................................................................................ 6

*Luense v. Konica Minolta Bus. Sols. U.S.A., Inc.*,
    541 F. Supp. 3d 496 (D.N.J. 2021) .................................................................. 21, 29

*Matney v. Barrick Gold of N. Am.*,
    80 F.4th 1136 (10th Cir. 2023) ................................................................ 24, 26, 27, 28

*Matousek v. MidAmerican Energy Co.*,
    51 F.4th 274 (8th Cir. 2022) ................................................................ *passim*

*Meiners v. Wells Fargo & Co.*,
    898 F.3d 820 (8th Cir. 2018) ................................................................ *passim*

*Pegram v. Herdrich*,
    530 U.S. 211 (2000) ................................................................ 28, 29

*Perry v. Fid. Mgmt. Tr. Co.*,
    257 F. Supp. 3d 117 (D. Mass. 2017) ................................................................ 18

*Riley v. Olin Corp.*,
    No. 4:21-cv-01328, 2022 U.S. Dist. LEXIS 109423 (E.D. Mo. June
    21, 2022) ................................................................ 16

*Rodriguez v. Hy-Vee, Inc.*,
    No. 4:22-cv-00072, 2022 U.S. Dist. LEXIS 200906 (S.D. Iowa Oct.
    21, 2022) ................................................................ 9

*Sandoval v. Exela Enterprise Solutions*,
    No. 3:17cv1573, 2020 U.S. Dist. LEXIS 253226, at *18-20 (D. Conn.
    Mar. 30, 2020) ................................................................ 18, 21

*Schave v. CentraCare Health Sys.*,
    No. 22-cv-1555, 2023 U.S. Dist. LEXIS 13786 (D. Minn. Jan. 27,
    2023) ................................................................ 28

*Schweitzer v. Inv. Comm. of the Phillips 66 Sav. Plan*,
    960 F.3d 190 (5th Cir. 2020) ................................................................ 20

*Smith v. CommonSpirit Health*,
    No. 20-95, 2021 U.S. Dist. LEXIS 169922 (E.D. Ky. Sept. 8, 2021),
    *aff'd* 37 F.4th 1160 (6th Cir. 2022) ................................................................ 23

*Stark v. KeyCorp*,
    No. 1:20-CV-01254, 2021 U.S. Dist. LEXIS 84813 (N.D. Ohio 2021) ................... 17

*Teets v. Great-West Life & Annuity Ins. Co.*,
    106 F. Supp. 3d 1198 (D. Colo. 2015) ................................................................ 18

*Tibble v. Edison Int'l*,
    135 S. Ct. 1823 (2015) ................................................................ 21

*Tobias v. Nvidia Corp.*,
    No. 20-CV-06081, 2021 U.S. Dist. LEXIS 173539 (N.D. Cal. Sept.
    13, 2021) ................................................................................... 26

*Tussey v. ABB, Inc.*,
    746 F.3d 327 (8th Cir. 2014) ............................................... 6, 11

*White v. Chevron Corp.*,
    No. 16-cv-0793, 2017 U.S. Dist. LEXIS 83474 (N.D. Cal. May 31,
    2017) ........................................................................................ 23

*Wood v. Prudential Ret. Ins. & Annuity Co.*,
    No. 3:15-cv-1785, 2017 U.S. Dist. LEXIS 123128 (D. Conn. Aug. 4,
    2017) .................................................................. 14, 18, 19, 21

*Young v. Gen. Motors Inv. Mgmt. Corp.*,
    325 F. App'x 31 (2d Cir. 2009) ............................................... 20

*Zean v. Fairview Health Servs.*,
    858 F.3d 520 (8th Cir. 2017) .................................................... 9

## Statutes and Regulations

29 C.F.R. § 2550.404c-1(b)(2)(ii)(C) ........................................... 3

29 C.F.R. § 2550.404c-1(b)(3) ...................................................... 3

29 U.S.C. § 1002(21)(A) ............................................................. 29

29 U.S.C. § 1101(b)(2) ............................................................... 20

## Other Authorities

Anderson, Brian, *7 Key Takeaways from 2023 Excess Fee and
    Performance Litigation*, 401kSpecialist (Jan. 16, 2024),
    https://401kspecialistmag.com/7-key-takeaways-from-2023-
    excess-fee-and-performance-litigation/ .................................... 10

*Investments: Explore our Funds*, Dimensional Fund Advisors,
https://www.dimensional.com/us-en/funds/ (last visited Apr.
23, 2024) ........................................................................................................... 25

*MassMutual Guaranteed Interest Account*, Empower Investments,
https://docs.retirementpartner.com/fundov/EMPOWER_MHPJ
A1_FUNDOV.PDF (last visited Apr. 23, 2024) .................................................... 20

**TABLE OF DOCUMENTS EMBRACED BY THE COMPLAINT**

| Document Embraced by Complaint | Abbreviation for Citations | Declaration[1] |
|---|---|---|
| Plan A Forms 5500 | Plan A Forms 5500 | Bullard, Ex. 1 |
| JEPST Plan Forms 5500 | JEPST Forms 5500 | Bullard, Ex. 2 |
| Dimensional Fund Advisors U.S. Large Cap Value Portfolio prospectuses | DFA Prospect. | Bullard, Ex. 3 |
| Dimensional Fund Advisors U.S. Large Cap Value Portfolio III prospectuses | Alt. DFA Prospect. | Bullard, Ex. 4 |
| Harbor Cap. Apprec. prospectuses | Harbor Prospect. | Bullard, Ex. 5 |
| Plan A official plan document | Plan A | Notermann, Ex. A |
| JEPST Plan official plan document | JEPST Plan | Notermann, Ex. B |
| Plan A prospectuses | Plan A Prospect. | Notermann, Ex. C |
| JEPST Plan prospectuses | JEPST Prospect. | Notermann, Ex. D |
| Plan A fee disclosures issued under ERISA § 404(a) | Plan A 404(a) Fee Discl. | Notermann, Ex. E |
| JEPST Plan fee disclosures issued under ERISA § 404(a) | JEPST 404(a) Fee Discl. | Notermann, Ex. F |
| Plan A fee disclosures issued under ERISA § 408(b)(2) | Plan A 408(b)(2) Fee Discl. | Notermann, Ex. G |
| JEPST fee disclosures issued under ERISA § 408(b)(2) | JEPST 408(b)(2) Fee Discl. | Notermann, Ex. H |
| 2016 Investment Change Brochure | 2016 Plan Comm'n | Notermann, Ex. I |

[1] For exhibits, all citations are to "Exhibit" page numbers at page bottom.

## <u>INTRODUCTION</u>

This lawsuit is the latest in an ongoing wave of ERISA class actions challenging the fees and performance of 401(k) plan investment options. Recognizing the cost and burden of that litigation and the need to "divide the meritless goats from the plausible sheep," the Supreme Court and Eighth Circuit have established pleading standards for ERISA breach of fiduciary duty claims. *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014). In short, a court must dismiss such a claim unless the allegations plausibly suggest that plan fiduciaries fell "asleep at the wheel" when monitoring plan investments. *Matousek v. MidAmerican Energy Co.*, 51 F.4th 274, 278 (8th Cir. 2022) (quotation omitted).

Plaintiff Scott Payne's claims against Hormel Foods Corporation ("Hormel") do not meet that standard. Controlling Eighth Circuit authority forecloses Payne's attempt to allege fiduciary imprudence with the mere allegation that the intentionally "safe" investment option in Hormel's plans had lower returns than two alternative investments. Payne also fails to allege that those two alternatives are "meaningful benchmarks," the key pleading standard required by the Eighth Circuit. Specifically, he does not allege that the alternatives have similar investment strategies, liquidity, risk profiles, or costs as the fund he challenges, so the comparison is a mismatch. Payne does not even plausibly allege that the alternative funds were *available* to the plans. All of this is fatal to Payne's claim.

Payne's remaining claim—that the plans improperly invested in "higher" cost shares of two mutual funds—also does not suggest fiduciary imprudence. With respect to the first fund, ERISA plan disclosures show that this fund paid Payne and other plan participants a rebate that exceeded its alleged "higher" cost, negating any inference of poor fiduciary process. As for the second fund, it is

1

available only to a limited universe of investors who secure consent from the fund's advisors—consent that Payne does not allege that the plans had or could have obtained. These fatal flaws in Payne's claims are revealed by the very same plan disclosures and mutual fund prospectuses that the Eighth Circuit has relied on in dismissing substantially identical ERISA claims.

In sum, Payne does not plausibly allege any fiduciary breach under Eighth Circuit pleading standards, so the Court should dismiss the Complaint.

## BACKGROUND[2]

### I.     Hormel's Retirement Plans

Hormel sponsors two retirement plans for its employees: the Tax Deferred Investment Plan A ("Plan A") and the Joint Earnings Profit Sharing Trust ("JEPST Plan") (together, the "Plans" or "Plan").[3] Compl. ¶¶ 1, 7. Plan A is a traditional 401(k) plan in which participants can contribute a portion of earnings on a tax-deferred basis to individual accounts to save for retirement. *See id.* ¶ 16. Hormel's JEPST Plan is a profit sharing plan, meaning Hormel contributes to eligible participants' accounts based on its profits. *See id.* ¶ 17. In both Plans, participants

---

[2] This Background draws only from the Complaint and documents it embraces, all of which the Court can consider in deciding the motion to dismiss. Specifically, the Complaint embraces the Plans' Form 5500 filings with the Department of Labor, the prospectuses of the funds at issue, and Plan prospectuses and disclosures. *See Matousek*, 51 F.4th at 279–82 (considering "prospectus[es]," "Form 5500s," and "participant-disclosure forms" as "embraced by the pleadings"); *Davis v. Wash. Univ. in St. Louis*, 960 F.3d 478, 484 n.3 (8th Cir. 2020) (same for "prospectuses and plan disclosure documents"); *Meiners v. Wells Fargo & Co.*, 898 F.3d 820, 823 (8th Cir. 2018) (same for "prospectuses").

[3] Hormel sponsors other retirement plans not at issue in this case.

can allocate the money in their individual accounts among an array of investment options. *See* Plan A Prospect. at 2–3, 8–9; JEPST Prospect. at 2–3, 8–9.

Hormel makes substantial "employer" contributions to its employees' retirement savings in both Plans. For example, in 2021, Hormel contributed over $28 million to the Plans. Plan A Forms 5500 at 25; JEPST Forms 5500 at 28.

## II.    The Challenged Plan Investment Options

Throughout the class period, Plaintiff Scott Payne had the opportunity to invest in over 20 different funds available to Plan participants. *See* Plan A Prospect. at 2–3, 8–9; JEPST Prospect. at 2–3, 8–9; Plan A Forms 5500 at 18, 31; JEPST Forms 5500 at 20, 35. That investment lineup spans the risk-return spectrum—from lower-risk bond funds (like the Core Plus Bond Fund) to potentially higher-returning, higher-risk equity funds (like the Global Equity Fund). *Id.*

Payne does not dispute that the vast majority of the Plans' funds had low fees and strong performance and thus were appropriate investment options. *See* Compl. ¶¶ 16–64. He takes issue with just three of the Plans' 20 plus funds: the guaranteed investment contract ("Plans' GIC"), the DFA US Large Cap Value Fund ("DFA Fund"), and the Harbor Capital Appreciation Fund ("Harbor Fund"). *Id.* ¶¶ 28, 39.

### A.    The Plans' GIC

Department of Labor ("DOL") regulations encourage 401(k) plans to include at least one "safe" option—an "income producing, low risk, liquid" fund. 29 C.F.R. § 2550.404c-1(b)(2)(ii)(C), (b)(3). These "safer" funds include a constellation of "stable value funds" that come in different forms with "many important differences." DOL ERISA Advisory Council, Report on Stable Value Funds and

Retirement Security in the Current Economic Conditions (2009) ("DOL Report") at 3.[4] One type of stable value fund is a "guaranteed investment contract" or "GIC." Compl. ¶ 20. Unlike most funds in which returns are based on performance of underlying investments (stocks, bonds, etc.), a GIC is a contract under which an insurance company promises to pay a guaranteed return on investment. *Id.* ¶¶ 20–25. GICs come in different forms, including general-account GICs, "synthetic" GICs, pooled accounts, and separate-account GICs—all with different features, costs, risks, promised returns, and other tradeoffs. *See* DOL Report at 3 (explaining "differences among [the] various" GICs).

In this case, the Plans provided, as their "safer" investment option, a GIC offered by Massachusetts Mutual Life Insurance Company ("MassMutual").[5] Compl. ¶ 20. As Plan disclosures explain, the Plans' GIC "is appropriate for investors who place a higher value on stability of principal than on long-term growth." Plan A Prospect. at 3, 9; JEPST Prospect. at 3, 9. Like other GICs, the Plans' GIC's returns do not depend on the performance of underlying investments. Rather, MassMutual contractually promises to pay the Plans a guaranteed return, called the "crediting rate." Compl. ¶ 22. MassMutual resets the crediting rate at regular intervals, but guarantees it "will never fall below 3.00%" for the life of the contract. *E.g.*, Plan A 404(a) Fee Discl. at 2. That crediting rate

---

[4] The excerpted DOL Report is attached as Exhibit 6 to the Bullard Declaration.

[5] In 2020, MassMutual's retirement plan business was acquired by Great-West Life & Annuity Insurance Company, which operates as Empower Retirement. Because the Complaint refers only to "MassMutual," Compl. ¶¶ 20–34, this motion does the same.

ranged between 3.0% and 3.2% from 2017 to 2022. Compl. ¶ 28. In addition to that guaranteed return, MassMutual provides "safety of principal" that "is backed by MassMutual's general investment account." Plan A Prospect. at 3, 9; JEPST Prospect. at 3, 9.

### B.   The Harbor Fund

Payne also claims the Harbor Fund was an imprudent plan investment option. *Id.* ¶ 39. The Harbor Fund is a mutual fund invested in stocks "of U.S. companies with market capitalizations of at least $1 billion." Plan A Prospect. at 4; JEPST Prospect. at 4.

Like all mutual funds, the Harbor Fund charges investment management fees expressed as a percentage of fund assets (called an "expense ratio"). According to the Complaint, the Plans offered the "Institutional" share class of the Harbor Fund with an expense ratio of 0.65% to 0.67% (or 65 to 67 basis points).[6] Compl. ¶ 39. Payne does not claim the Harbor Fund performed poorly. Instead, he claims the Plans should have offered the "Retirement" share of the Harbor Fund that was 8 basis points "less expensive" than the "Institutional" share. *Id.*

Payne's claim, however, ignores the rebate of 10 basis points that he and other Plan participants received from the Harbor Fund through a practice called "revenue sharing." Revenue sharing is a common, lawful practice in which a mutual fund pays a portion of its fees to a 401(k) plan's recordkeeper for making the fund available to the recordkeeper's customers. *See Matousek*, 51 F.4th at 279 (explaining "revenue-sharing payments"); *Tussey v. ABB, Inc.*, 746 F.3d 327, 336

---

[6] "A 'basis point' is 1/100 of one percent." *In re GSE Bonds Antitrust Litig.*, 396 F. Supp. 3d 354, 359 n.4 (S.D.N.Y. 2019).

(8th Cir. 2014) ("revenue sharing" is a "common and 'acceptable' . . . practice"). The recordkeeper may either credit that revenue to a plan as payment for services or refund that revenue directly to plan participants. *See Lucas v. MGM Resorts Int'l*, No. 2:20-cv-01750, 2024 U.S. Dist. LEXIS 49215, at *7 (D. Nev. Mar. 19, 2024).

Throughout the putative class period, the Plans directed MassMutual to refund all revenue sharing it received to Plan participants who invested in funds that paid revenue sharing.[7] As Plan disclosures explained, "revenue sharing will be returned back to the participants investing in these options on a monthly basis and will be included as additional 'investment earnings.'" 2016 Plan Comm'n at 3.[8] Plan disclosures identified which funds paid revenue sharing and how much Plan participants like Payne would receive. *Id.* This included the Harbor Fund (*id.*):

| Investment Option | Expense Ratio (Includes Revenue Sharing)) | Revenue Sharing |
|---|---|---|
| Harbor Capital Appreciation | .65% | .10% |

In other words, documents embraced by the Complaint contradict Payne's allegation that the Harbor Fund's Retirement share class was 8 basis points "less

---

[7] The Plans' Recordkeeper was MassMutual until 2020, at which point Empower acquired MassMutual's retirement business. *Supra* at 4 n.5. As noted, both are referred to as "MassMutual" for purposes of this motion. *Id.*

[8] Rather than revenue sharing going to pay for recordkeeping services, that revenue was refunded to participant accounts, and participants paid a low flat fee of just $29 per participant for recordkeeping services for most of the class period. Plan A 404(a) Fee Discl. at 4, 7, 10, 14, 23, 29; JEPST 404(a) Fee Discl. at 3, 6, 9, 12, 21, 27. Unlike many 401(k) fee cases—including cases filed by Payne's counsel—Payne does not challenge the Plans' low recordkeeping costs. Indeed, the $29 per participate fee is significantly lower than what other courts have found is a reasonable recordkeeping fee. *Cf. Albert v. Oshkosh Corp.*, 47 F.4th 570, 579–80 (7th Cir. 2022) ($87 per participant).

expensive" than the Institutional share in the Plans. That Institutional share was 2 basis points cheaper than the Retirement share, after accounting for the rebate of 10 basis points that Payne and other Plan participants received.

### C.    The DFA Fund

Finally, Payne claims the Plans' DFA Fund was an imprudent investment option. Compl. ¶ 39. The DFA Fund invests "in securities of large-capitalization U.S. companies." Plan A Prospect. at 4; JEPST Prospect. at 4. As with the Harbor Fund, Payne does not take issue with the DFA Fund's performance. He claims only that a cheaper "share class" was available that charged 8 to 14 basis points less than the share class in the Plans. *See* Compl. ¶ 39. During the meet-and-confer process, Payne's counsel corrected a "clerical error" in the Complaint and clarified that the alleged "less expensive" DFA Fund option was a separate mutual fund ("Alternative DFA Fund"), not a separate share class of the DFA Fund.[9] The Alternative DFA Fund is closed to investors unless they receive express "approval of the Advisor." Alt. DFA Prospect. at 1, 3, 5, 7, 9. Payne does not allege that the Plans had or could have secured that approval. *See generally* Compl.

### III.    Payne's Claims

Unlike many recent 401(k) class action lawsuits, Payne makes no attempt to allege wide-spread or systemic mismanagement of the Plans. He takes issue with only three of the 20 plus funds the Plans offered during the class period. See

---

[9] Specifically, the Complaint identifies the "less expensive" DFA Fund option as "DFLUX Institutional Class." Compl. ¶ 39. Payne's counsel clarified that "DFLUX" is a "clerical error"; the Complaint should refer to "DFUVX," with Payne's counsel attaching prospectuses for a separate mutual fund called "U.S. Large Cap Value Portfolio III." Bullard Decl., Ex. 7.

Compl. ¶¶ 20–41. Beyond those three, he does not dispute that the Plans are well managed. He does not challenge the Plans' recordkeeping fee, *see supra* p. 6 n.8, nor does he dispute that the vast majority of the Plans' funds were prudent investment options. *See generally* Compl.

Instead, Payne's attempt to establish fiduciary imprudence narrowly focuses on just three of the Plans' funds on two theories.

**The GIC Claim.** Payne claims the Plans' GIC "underperformed" other "stable-value investments." Compl. ¶¶ 20–34. He bases this claim on a retrospective comparison of the crediting rates of the Plans' GIC and two alternative stable value funds: (1) unidentified "MassMutual separate-account GICs" and (2) "TIAA-CREF traditional general-account annuities." *Id.* ¶¶ 28–29. According to Payne, Defendants should have selected "better-performing stable-value investments." *Id.* ¶ 33.

**The Share Class Claim.** Payne also claims the Plans did not offer the cheapest "share class" for the Harbor and DFA Funds. Compl. ¶ 39. Specifically, he alleges that the Plans invested in the Harbor Fund's Institutional share, which allegedly cost 8 basis points more than the Retirement share. *Id.* But, as noted, after accounting for the 10 basis points of revenue sharing that the Institutional share paid Payne and other Plan participants, it cost less than the Retirement share. *See supra* 5–7. As for the DFA Fund, Payne alleges that the Plans should have offered the Alternative DFA Fund, but he does not allege that fund was available to the Plans. *See supra* 7.

## MOTION TO DISMISS STANDARD

To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* If a complaint "is deficient under Rule 8," then the plaintiff is "not entitled to discovery, cabined or otherwise." *Id.* at 686. When, as here, documents embraced by the Complaint "contradict the Complaint, the [documents] trump the facts or allegations presented in the Complaint." *Chi. Dist. Council of Carpenters Welfare Fund v. Caremark, Inc.*, 474 F.3d 463, 466 (7th Cir. 2007); *see also Zean v. Fairview Health Servs.*, 858 F.3d 520, 526–27 (8th Cir. 2017) (same); *Rodriguez v. Hy-Vee, Inc.*, No. 4:22-cv-00072, 2022 U.S. Dist. LEXIS 200906, at *13 (S.D. Iowa Oct. 21, 2022) ("the Eighth Circuit has . . . presumed the accuracy of" "documents embraced by the pleadings").

## ARGUMENT

### I. Payne must plausibly allege that Defendants had a flawed fiduciary process for monitoring the Plans' investments

This case is one of hundreds of ERISA class actions filed in the last decade challenging the fees and performance of 401(k) investment options. Over 250 such lawsuits were filed in the last four years alone.[10]

---

[10] Anderson, Brian, *7 Key Takeaways from 2023 Excess Fee and Performance Litigation*, 401kSpecialist (Jan. 16, 2024), https://401kspecialistmag.com/7-key-takeaways-from-2023-excess-fee-and-performance-litigation/.

Recognizing the cost and burden of ERISA litigation, the Supreme Court has stressed that Rule 12(b)(6) motions like this one are an "important mechanism for weeding out meritless claims." *Dudenhoeffer*, 573 U.S. at 425. The Court has thus instructed lower courts to engage in "careful, context-sensitive scrutiny" of allegations to "divide the plausible sheep from the meritless goats." *Id.* That "scrutiny" must focus on "the circumstances . . . prevailing at the time the fiduciary act[ed]," (*id.* (quotation omitted)), and "must give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise." *Hughes v. Nw. Univ.*, 142 S. Ct. 737, 742 (2022).

Following the Supreme Court's mandate, the Eighth Circuit has laid down several core principles to guide courts in assessing claims that plan fiduciaries imprudently selected and maintained plan investments.

*First*, because ERISA fiduciary duties focus on the fiduciary's "decision-making process" and "not the results" of any particular investment, a plaintiff cannot state a claim unless he "plausibly" alleges that the fiduciary's "decision-making process itself was flawed." *Matousek*, 51 F.4th at 278–80 (citations omitted); *see also Meiners*, 898 F.3d at 822–23; *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 595–96 (8th Cir. 2009). While a plaintiff may use "circumstantial allegations" to meet that standard, the allegations must plausibly suggest that the fiduciaries' "methods" were flawed based on the information available to the fiduciaries at the time any allegedly imprudent decision was made. *Meiners*, 898 F.3d at 822.

*Second*, a plaintiff cannot meet that pleading standard with the "bare allegation that costs" for an investment "[we]re too high, or returns [we]re too low." *Davis*, 960 F.3d at 484. Rather, a plaintiff must at minimum provide "a

meaningful benchmark" against which to compare the cost and performance of a challenged investment. *Meiners*, 898 F.3d at 822. This "meaningful benchmark" must account for the nature and style of the challenged investment, because "some investments are simply meant to pay off less than others, in return for lower risks, different exposures, or countless other considerations." *Tussey*, 850 F.3d at 960 n.8. A benchmark is therefore "meaningful" only if it offers an "apples" to "apples" comparison, meaning that the proposed benchmark has the same "aims," "risks," and "rewards" as the challenged fund. *Davis*, 960 F.3d at 485 (citing *Meiners*, 898 F.3d at 823); *see also Matousek*, 51 F.4th at 282 (same).

*Third*, when conducting the required "context-sensitive scrutiny," *Dudenhoeffer*, 573 U.S. at 425, a court must evaluate both the allegations and documents "embraced by the pleadings." *Meiners*, 898 F.3d at 823. This includes fund prospectuses, Forms 5500, and plan documents and disclosures. *See id.* at 823 (considering "prospectuses"); *Matousek*, 51 F.4th at 279–82 (considering "prospectus[es]," "Form 5500s," and "participant-disclosure forms"); *Davis*, 960 F.3d at 484 n.3 (considering "prospectuses and plan disclosure documents").

## II.  The GIC Claim does not plausibly suggest a flawed fiduciary process

Payne cannot plausibly allege a flawed fiduciary process with allegations that two other stable value funds—MassMutual separate-account GICs and TIAA-CREF traditional annuities (the "Stable Value Comparators")—had "higher crediting rates" than the Plans' GIC over a seven-year period. Compl. ¶¶ 3, 28–29. It is settled law that merely identifying "superior-performing investments" does not suggest fiduciary imprudence. *Matousek*, 51 F.4th at 282; *see also Meiners*, 898

F.3d at 823 n.3 ("a particular fund is not flawed merely because of the existence of one fund that ended up performing better").

That settled principle is even more important in the context of stable value funds, because they are not meant to chase returns but rather "provide participants with an option that protects their principal." Compl. ¶ 21. As Plan disclosures explain, the Plans' GIC "is appropriate for investors who place a higher value on stability of principal than on long-term growth." Plan A Prospect. at 3, 9; JEPST Prospect. at 3, 9. Such "conservativism in the management of a stable value fund—when consistent with the fund's objectives disclosed to the plan participants—is no vice." *Barchock v. CVS Health Corp.*, 886 F.3d 43, 50 (1st Cir. 2018). There is therefore serious "doubt" that a plaintiff can ever plausibly allege fiduciary misconduct on the theory that a "stable value fund" had poor returns or was "too conservative," as Payne attempts in this case. *Id.* at 49–50 (discussing *Ellis v. Fid. Mgmt. Tr. Co.*, 883 F.3d 1 (1st Cir. 2018)).

Even assuming such a claim were possible, the GIC Claim fails to satisfy Eighth Circuit pleading standards for three reasons. First, Payne does not allege that the Plans could have received the "crediting rates" allegedly offered by the Stable Value Comparators. Second, those Comparators are not "meaningful benchmarks," because Payne does not allege that they have similar holdings, investment style, strategy, or cost as the Plans' GIC. Finally, even if the Stable Value Comparators were meaningful benchmarks, the alleged duration and amount of alleged "underperformance" is nowhere near what courts have found necessary to suggest a flawed fiduciary process.

A.    **Payne fails to allege that the Stable Value Comparators' "crediting rates" were available to the Plans**

The GIC Claim fails at the start because Payne does not allege that the Plans could have actually received the "crediting rates" allegedly offered by the Stable Value Comparators. Under Eighth Circuit law, Payne cannot allege fiduciary imprudence from retaining a fund without, at minimum, identifying alternative funds actually available to the plans. *See Matousek*, 51 F.4th at 280–82. Without that essential baseline allegation, there is no basis from which to infer that Defendants fell "asleep at the wheel" in not removing the Plans' GIC from the Plans' investment lineup. *Id.* at 278 (quoting *Davis*, 960 F.3d at 483).

The Eighth Circuit explained this requirement in *Matousek*, a case involving the claim that a plan's recordkeeping fees were "too high" because other plans had "lower fees." 51 F.4th at 278–79. Affirming dismissal of that claim, the Eighth Circuit held that such a comparison does not suggest fiduciary imprudence without plausible allegations that lower fees for the same services were available to the plan. *Id.* at 279–80. The plaintiffs' allegations did not meet that standard. The plaintiffs did not, for example, "point to the fees paid by other specific, comparably sized plans" with similar bargaining power. *Id.* at 279. The mere fact that some other plans—potentially much larger with greater bargaining power—negotiated lower fees did not suggest that plaintiffs' plan was poorly run. *Id.* at 280.

Courts apply this same principle to dismiss ERISA challenges to stable value funds where, as here, the plaintiff fails to allege that the alternative stable value option was actually available to the plaintiff's plan. *See Lalonde v. Mass. Mut. Ins. Co.*, No. 22-30147, 2024 U.S. Dist. LEXIS 57670, at *8, 27–28 (D. Mass. Mar. 29, 2024) (dismissing claim comparing general-account GIC and "Separate Account

13

Guaranteed Interest Contract"); *Laabs v. Faith Techs., Inc.*, No. 20-CV-1534, 2023 U.S. Dist. LEXIS 233547, at *23–24 (E.D. Wis. Aug. 30, 2023) (dismissing stable value fund claim because plaintiff failed to plausibly allege the plan could have "obtained" the alternative investment).

The same is true here. While Payne claims some separate-account GICs have higher "crediting rates," he does not allege that the Plans could have obtained those rates. Payne merely cites aggregate "typical crediting rates" drawn from an unknown source. Compl. ¶ 28. Payne never alleges, even in conclusory terms, that MassMutual would have agreed to offer those "typical" crediting rates to the Plans. To the contrary, he admits crediting rates are negotiated and depend on "bargaining power," *id.* ¶ 36, and he does not allege that the Plans had sufficient bargaining power to obtain these "typical" rates. *Id.* ¶¶ 20–34. Nor does he identify any specific plan—much less a plan of comparable size and negotiating power— that secured the "typical crediting rates" alleged in the Complaint. *Id.* ¶ 28. Nothing in the Complaint suggests that the aggregate "typical crediting rates"— which presumably include rates negotiated by much larger plans or other large institutional investors—were available to the Plans. *See Wood v. Prudential Ret. Ins. & Annuity Co.*, No. 3:15-cv-1785, 2017 U.S. Dist. LEXIS 123128, at *9–10 (D. Conn. Aug. 4, 2017) (explaining variability in GIC "crediting rates" and noting that "new or large funds are often given more favorable crediting rates").

Payne's allegation that "the Plans received a lower crediting rate" than "other comparable Plans received" does not cure this defect for two reasons. Compl. ¶ 27. First, Payne does not allege what rate those unidentified "plans" negotiated, nor does he allege that those "plans" negotiated the "typical" crediting

rates in paragraph 28 of the Complaint. *Id.* Second, Eighth Circuit law is clear that merely labeling plans "comparable" is insufficient to allege that they are similarly situated to a plaintiff's plan. *Matousek*, 51 F.4th at 279–82. Rather, a plaintiff must provide the "details" about the "other specific, comparably sized plans," including how large they are. *Id.*; *see also Fritton v. Taylor Corp.*, No. 22-cv-00415 (ECT/TNL), 2022 U.S. Dist. LEXIS 222996, at *26–27 (D. Minn. Dec. 12, 2022) (dismissing claim when "the Complaint lacks allegations plausibly showing" another plan was "a viable comparator"). Payne does not even identify the "comparable Plans," much less explain how they are "comparable." Compl. ¶ 27.

Likewise, Payne's allegation that the Plans "have considerable leverage to bargain for higher crediting rates" does not save the GIC Claim. *Id.* ¶ 30. Payne does not allege what specific "higher crediting rates" the Plans could have secured. He does not even allege that the Plans could have negotiated the "typical" crediting rate in paragraph 28 of the Complaint. Once again, the Eighth Circuit has already held that this allegation does not suggest fiduciary imprudence; in *Matousek*, the assertion that "a larger plan like this one should have lower fees" failed to state a claim. *Matousek*, 51 F.4th at 278–80; s*ee also Laabs*, 2023 U.S. Dist. LEXIS 233547, at *22–24 (dismissing claim that "plan should have leveraged its substantial bargaining power to obtain better crediting rates"). As in *Matousek*, the GIC Claim fails because Payne does not plausibly allege that the Plans could have obtained a higher crediting rate.

### B.   Payne fails to allege that the Stable Value Comparators are "meaningful benchmarks," as required by the Eighth Circuit

Even if Payne had plausibly alleged that the Plans could have received the Stable Value Comparators' crediting rates, those Comparators are not

"meaningful benchmarks," as "the Eighth Circuit requires." *Riley v. Olin Corp.*, No. 4:21-cv-01328, 2022 U.S. Dist. LEXIS 109423, at *13, *20–21 (E.D. Mo. June 21, 2022) (discussing *Davis*, 960 F.3d at 484–87).

While Payne alleges without explanation that the Stable Value Comparators are "substantially identical" to the Plans' GIC, Compl. ¶ 31, such conclusory labels do not satisfy the meaningful benchmark requirement. *See Lalonde*, 2024 U.S. Dist. LEXIS 57670, at *28 (dismissing claim that "materially identical" stable value fund was available); *Laabs*, 2023 U.S. Dist. LEXIS 233547, at *22–24 (same for allegedly "identical" stable value fund comparator). Under Eighth Circuit law, Payne must allege plausible "facts"—not mere conclusions—showing how the Stable Value Comparators are "truly comparable benchmark[s]," *Davis*, 960 F.3d at 485, because that is the "key" pleading standard. *Matousek*, 51 F.4th at 278. Among the facts necessary to make that showing are whether his Comparators "hold similar securities, have similar investment strategies, and reflect a similar risk profile" as the Plans' GIC. *Id.* at 281; *see also Davis,* 960 F.3d at 485 (requiring similar investment "aims," "risks," and "strategies"); *Meiners*, 898 F.3d at 823–24 (similar).

For example, in *Davis*, the Eighth Circuit rejected a claim that a plan's conservative investment option, the "TIAA Traditional Annuity," was an imprudent investment option. 960 F.3d at 486. The plaintiff challenged the annuity because it was illiquid—a participant had to pay substantial penalties to get money out of the annuity. *Id*. Though that was a "drawback," the annuity offered benefits, including a "guaranteed stream of payments . . . at retirement." *Id.* The claim failed because the plaintiff identified no "meaningful benchmark," i.e., another "investment with a similar risk-and-reward profile that offers better terms than

[the] TIAA Traditional Annuity." *Id*. The court emphasized that the "unique" nature of this conservative fund "shows why a meaningful benchmark is so important." *Id*. "Some investors are perfectly willing to trade liquidity and higher returns for reduced risk and guaranteed income," so "a prudent fiduciary [could] offer" participants the opportunity to invest in the annuity. *Id*. at 486–87.

This same principle applies in cases involving challenges to stable value funds. *See Stark v. KeyCorp*, No. 1:20-CV-01254, 2021 U.S. Dist. LEXIS 84813, at *38 (N.D. Ohio 2021) (dismissing challenge to stable value fund because the plaintiff did "not fully demonstrate[] that the [comparator] funds all had the same investment strategy"); *see also, e.g.*, *Lalonde*, 2024 U.S. Dist. LEXIS 57670, at *28; *Laabs*, 2023 U.S. Dist. LEXIS 233547, at *22–24. As in all these cases, Payne fails to allege that the Stable Value Comparators are an "apples to apples" comparison to the Plans' GIC, because he fails to address the myriad potential differences between those various investment options.

### 1. Payne fails to allege whether the Stable Value Comparators have a similar guaranteed minimum return as the Plans' GIC

Unlike many investments, the Plans' GIC has a guaranteed minimum return that "will never fall below 3.00%" for the life of the contract. Plan A 404(a) Fee Discl. at 2, 6, 9, 12, 17, 28; JEPST 404(a) Fee Discl. at 2, 5, 8, 11, 15, 16. Not all stable value funds offer such a guarantee. *See Perry v. Fid. Mgmt. Tr. Co.*, 257 F. Supp. 3d 117, 120 (D. Mass. 2017) (discussing stable value funds that "do not guarantee that investors will earn a return"). Even among GICs, there is wide "diversity of guaranteed minimums," *Wood*, 2017 U.S. Dist. LEXIS 123128, at *2–3, 12, including

GICs that offer only a "0%" guarantee. *Teets v. Great-West Life & Annuity Ins. Co.*, 106 F. Supp. 3d 1198, 1200 (D. Colo. 2015).[11]

GIC comparisons are meaningful only if they compare funds with the same or similar minimum guarantees. For example, in *Sandoval v. Exela Enterprise Solutions*, a plaintiff alleged that plan fiduciaries "breached their fiduciary duties by offering" a "Guaranteed Income Fund," which "guarantee[d] a 1.50% return," because that fund underperformed or was more expensive than "eleven other stable value funds." No. 3:17cv1573, 2020 U.S. Dist. LEXIS 253226, at *18–20 (D. Conn. Mar. 30, 2020). The court dismissed the claim because "[t]here is no allegation that any of the other eleven stable value funds guaranteed any rate of return," so the plaintiff failed to establish an apples-to-apples comparison. *Id.*

Here, Payne does not allege whether the Stable Value Comparators have a guaranteed minimum return — or if they do, what that minimum is. *See* Compl. ¶¶ 20–34. Payne therefore has not alleged an apples-to-apples comparison to the Plans' GIC with its 3% guaranteed minimum return. *See Matousek*, 51 F.4th at 281 (requiring that comparators "reflect a similar risk profile"); *Davis*, 960 F.3d at 485 (requiring similar investment "aims," "risks," and "strategies"); *Meiners*, 898 F.3d at 823–24 (similar). Even if the Stable Value Comparators offered higher crediting rates in exchange for lower or no guaranteed minimum, a "prudent fiduciary can offer [participants] that choice" to trade "higher returns for reduced risk and guaranteed income." *Davis*, 960 F.3d at 486–87.

---

[11] *See also, e.g.*, *Wood*, 2017 U.S. Dist. LEXIS 123128, at *3 (discussing GICs with guaranteed minimums from "1.5 percent . . . up to 3 percent" or minimums "set based on a National Association of Insurance Commissioners formula").

### 2. Payne fails to allege whether the Stable Value Comparators have a similar crediting rate methodology as the Plans' GIC

As the DOL recognizes, GICs set crediting rates in different ways—"the rate of return may be fixed, indexed, or reset periodically based on the actual performance of the underlying assets." DOL Advisory Report at 3. Each method has relative upsides and risks. *See id.* Payne does not allege how the crediting rate is set for the Plans' GIC or the Stable Value Comparators. He therefore fails to allege an apples-to-apples comparison. *See Matousek*, 51 F.4th at 279–81; *Fritton*, 2022 U.S. Dist. LEXIS 222996, at *25 ("the absence of [information on how fees are calculated] means the [alleged comparators] are not meaningful benchmarks").

### 3. Payne fails to allege whether the Stable Value Comparators have similar liquidity as the Plans' GIC

Stable value funds also vary in how easy or difficult it is to pull money out of the fund, as courts recognize. For example, in *Davis*, the Eighth Circuit noted "how difficult it is to pull money out" of the TIAA Traditional Annuity, one of the Stable Value Comparators. 960 F.3d at 486–87. Doing so takes ten years unless a participant "pays a 'substantial penalty'" or "a 2.5% surrender charge." *Id.* Among GICs, too, there also "diversity of . . . withdrawal and termination policies." *See Wood*, 2017 U.S. Dist. LEXIS 123128, at *13. Payne does not allege how difficult or easy it is to pull money out of the Plans' General-Account GIC or the Comparators, Compl. ¶¶ 20–34, and therefore fails to allege an apples-to-apples comparison. *See Davis*, 960 F.3d at 485–86.

### 4. Payne admits the Stable Value Comparators have different risk profiles than the Plans' GIC

Payne claims that general-accounts GIC are "not adequately diversified" and subject to "single-entity credit risk"—i.e., risk of MassMutual going bankrupt. Compl. ¶ 34. General-account GICs, however, are commonplace in retirement

19

plans, as ERISA, the DOL, and courts all recognize.[12] Payne makes no plausible allegation that MassMutual, whose entire "general investment account" backs up the Plans' GIC, is at risk of a catastrophic collapse. *See* Compl. ¶¶ 20–34. Nor does Payne allege that (1) the underlying assets in the "general investment account" are undiversified or (2) that the underlying investments in his Comparators are diversified. *See id.* This alleged "single-entity credit risk" is not plausible.[13]

More fundamentally, however, Payne's allegations about risk only underscore the material differences between general- and separate-account GICs. While the Plans' GIC may face a risk of loss in the extraordinary event that MassMutual goes bankrupt, it also guarantees a 3% return regardless of the performance of the market. Separate-account GICs, in turn, carry their own risks and rewards. "Unlike investments in an insurer's general account, gains and losses within separate accounts cannot be offset by the performance of other

---

[12] ERISA specifically contemplates that plans may offer general-account GICs, *see* 29 U.S.C. § 1101(b)(2), the DOL lists general-account GICs among the common types of stable value funds, DOL Report at 3, and courts routinely reject challenges that general-account GICs are imprudent. *See, e.g.*, *Lalonde*, 2024 U.S. Dist. LEXIS 57670, at *7–8, *27–28; *England v. Denso Int'l Am., Inc.*, No. 22-11129, 2023 U.S. Dist. LEXIS 131386, at *24–27 (E.D. Mich. July 28, 2023); *Laabs*, 2021 U.S. Dist. LEXIS 260699, at *21–22.

[13] MassMutual's general account *is* diversified among bonds, securities, loans, real estate, cash, and other investments. *See MassMutual Guaranteed Interest Account*, Empower Investments, https://docs.retirementpartner.com/fundov/EMPOWER_MHPJA1_FUNDOV.PDF (last visited Apr. 23, 2024). In any event, ERISA "does not require that each investment option be diversified." *Harmon v. FMC Corp.*, No. 16-6073, 2018 U.S. Dist. LEXIS 43222, at *13 (E.D. Pa. Mar. 16, 2018). The duty to diversify concerns the "plan as a whole, not to each investment option." *Schweitzer v. Inv. Comm. of the Phillips 66 Sav. Plan*, 960 F.3d 190, 195 (5th Cir. 2020); *see also Young v. Gen. Motors Inv. Mgmt. Corp.*, 325 F. App'x 31, 33 (2d Cir. 2009) (same).

investments." *Wood*, 2017 U.S. Dist. LEXIS 123128, at *13. In other words, unlike the Plans' GIC which is backed by all of MassMutual's general assets, a separate-account GIC is backed solely by the investments in the separate account. If those investments lose money, there is no recourse beyond the separate account. A prudent fiduciary may choose to shield participants from that risk and offer a general-account GIC instead of a separate-account GIC.

### 5. Payne fails to allege whether the Stable Value Comparators cost the same as the Plans' GIC

Payne fails to allege the cost or fees associated with the Plans' GIC and the Stable Value Comparators. Cost is an important consideration that fiduciaries must take into account. *See Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1826 (2015). Courts recognize there is "diversity" of "asset charges" and fees associated with stable value funds, including among GICs. *See Wood*, 2017 U.S. Dist. LEXIS 123128, at *13; DOL Report at 5 (noting "costs and fees" are "an important factor in determining the efficiency and prudence" of stable value funds).[14] Absent any allegation about relative costs, the Stable Value Comparators are not "meaningful benchmarks," so there is no basis to infer fiduciary imprudence.

For example, in *Laabs*, the plaintiff challenged the plan's "Guaranteed Income Fund" because "a superior product with [higher] crediting rates" was allegedly available. 2023 U.S. Dist. LEXIS 233547, at *21–24. The court concluded that the alternative product was not a "meaningful comparator" because, among other reasons, the plaintiff failed to "specify[] the fees associated with that

---

[14] *See also, e.g.*, *Dale v. NFP Corp.*, 658 F. Supp. 3d 620, 642 (N.D. Ill. 2023) (GIC "advisory fee"); *Luense v. Konica Minolta Bus. Sols. U.S.A., Inc.*, 541 F. Supp. 3d 496, 514 (D.N.J. 2021) ("expense ratio paid by Participants in the GIC"); *Sandoval*, 2020 U.S. Dist. LEXIS 253226, at *19 (discussing GIC's "0.40% fee").

investment." *Id.* The same is true here. Payne fails to allege the fees associated with the Stable Value Comparators and fails to allege whether their "crediting rates" are net or gross of fees, making the comparison meaningless. *See Fritton*, 2022 U.S. Dist. LEXIS 222996, at *22–27.

> **6.   Payne fails to allege whether the Stable Value Comparators' underlying investments are similar to those in the Plans' GIC**

Payne also fails to allege whether the Stable Value Comparators and Plans' GIC "hold similar securities" and other underlying investments, as the Eighth Circuit requires, *see* Compl. ¶¶ 20–34, so he fails to allege an apples-to-apples comparison. *See Matousek*, 51 F.4th at 281 (requiring that comparators "hold similar securities"); *Davis*, 960 F.3d at 485 (similar); *Meiners*, 898 F.3d at 823–24 (similar).

> **C.   The alleged "underperformance" does not plausibly suggest a flawed fiduciary process**

Even if the Stable Value Comparators were meaningful benchmarks, the alleged duration of the Plans' GIC's "underperformance" (seven years) is not long enough to suggest a flawed fiduciary process. 401(k) plans are designed to have "long-range investment strateg[ies]," so fiduciary standards "plainly permit[]" the "common practice of retaining investments through periods of under-performance." *White v. Chevron Corp.*, No. 16-cv-0793, 2017 U.S. Dist. LEXIS 83474, at *64 (N.D. Cal. May 31, 2017). That principle is even more important for stable value funds that are designed to protect principal not chase returns. Compl. ¶ 21. Courts therefore refuse to infer fiduciary imprudence from allegations that "two alleged comparator funds [had] higher credit return rates over a seven-year period" than the plan's stable value fund. *Lalonde*, 2024 U.S. Dist. LEXIS 57670, at *28; *see also*, *e.g.*, *Barchock*, 886 F.3d at 49–50 (dismissing claim premised on four

years of lower stable value fund returns); *England*, 2023 U.S. Dist. LEXIS 131386, at *24–27 (rejecting "underperforming stable value fund" claim because the fund "is supposed to grow for several decades"). Here, too, Payne's allegations about seven-year returns do not plausibly suggest imprudence.[15]

## III.   The Share Class Claim fails to plausibly suggest a flawed fiduciary process

The Share Class Claim also fails to state a claim. Payne's "mere allegations" that "cheaper" share classes were available for the DFA and the Harbor Funds do not provide a "golden ticket past a motion to dismiss." *Forman v. TriHealth, Inc.*, 40 F.4th 443, 453 (6th Cir. 2022). The "appropriate inquiry" is always "context specific." *Hughes*, 142 S. Ct. at 739. For that reason, courts have rejected any inference of a flawed fiduciary process where, as here, (a) the plaintiff fails to plausibly allege that the "cheaper" share class was available to the plan or (b) documents embraced by the complaint show that the share class in the plan was the net cheapest after accounting for revenue sharing. *See, e.g., Matney v. Barrick Gold of N. Am.*, 80 F.4th 1136, 1149–55 (10th Cir. 2023); *Johnson v. Parker-Hannifin*, No. 1:21-cv-00256, 2023 U.S. Dist. LEXIS 214747, at *23–30 (N.D. Ohio Dec. 4, 2023); *Boyette v. Montefiore Med. Ctr.*, No. 22-cv-5280, 2023 U.S. Dist. LEXIS 203442, at *17–19 (S.D.N.Y. Nov. 13, 2023).

---

[15] *See also Smith v. CommonSpirit Health*, No. 20-95, 2021 U.S. Dist. LEXIS 169922, at *25 (E.D. Ky. Sept. 8, 2021) (explaining that courts "have flatly held that allegations based on five-year returns are not sufficiently long-term to state a plausible claim of imprudence"), *aff'd* 37 F.4th 1160 (6th Cir. 2022).

### A.    Payne fails to allege that the Alternative DFA Fund was available to the Plans

Payne's allegation that Defendants should have replaced the DFA Fund with the Alternative DFA Fund fails to state a claim, because Payne does not allege that the Alternative DFA Fund was available to the Plans. To state a plausible share class claim, the plaintiff at minimum "is required to show that" the "cheaper . . . shares were plausibly available" to the plan at issue. *Hughes v. Nw. Univ.*, 63 F.4th 615, 635 (7th Cir. 2023); *see also Johnson*, 2023 U.S. Dist. LEXIS 214747, at *23–30; *cf. Larson v. Allina Health Sys.*, 350 F. Supp. 3d 780, 796 (D. Minn. 2018) (dismissing claim in part where lower fee alternatives were not available to the plan).

For example, in *Johnson*, the plaintiffs alleged "that Defendants breached their fiduciary duties by not obtaining the institutional shares with the lowest fees for" certain funds. 2023 U.S. Dist. LEXIS 214747, at *23–24. In assessing that claim, the court emphasized that "ERISA's 'context-sensitive' pleading analysis'" requires plausible allegations "that the plan *qualified* for lower-fee shares" that "were readily available." *Id.* at *26–29 (citation omitted). The *Johnson* plaintiffs did not meet the standard because they offered only a "naked assertion devoid of . . . factual enhancement" that "lower-fee shares could have been obtained through bargaining due to the Plan's size." *Id.* at *29 (citation omitted).

The same is true here. Payne has not plausibly alleged that the DFA Alternative Fund was actually available to Plans. As in *Johnson*, Payne offers only the naked assertion devoid of factual enhancement that the Plans "are among the larger plans that would typically qualify for less expensive share classes." Compl. ¶ 37. This is exactly the sort of conclusory statement that *Johnson* rejected.

Indeed, documents embraced by the Complaint show that the DFA Alternative Fund was not necessarily available to the Plans. That Fund's publicly-filed prospectus—a document the Eighth Circuit has directed courts to consider in evaluating motions to dismiss[16]—says that the fund is available only to those who secure express "approval of the Advisor." Alt. DFA Prospect. at 1, 3, 5, 7, 9. And DFA cautions investors that the DFA Alternative Fund is "restricted to specific institutional accounts."[17] Payne does not allege that the Plans had the advisor's "approval" or could have secured it, *see* Compl. ¶¶ 35–41, 49–64, so there is no basis to infer that the DFA Alternative Fund was available to the Plans. Payne fails to allege the required context necessary to make this Share Class Claim plausible.

### B.    The Plans' share class of the Harbor Fund was net cheaper than the alternative share identified by Payne

Likewise, Payne's allegation that the Plans should have offered a cheaper share class of the Harbor Fund fails to state a claim. As noted, courts have rejected any inference of a flawed fiduciary process where, as here, documents embraced by the complaint show that the share class in the plan was the net cheapest after accounting for revenue sharing. *See, e.g.*, *Matney*, 80 F.4th at 1149–55; *Tobias v. Nvidia Corp.*, No. 20-CV-06081, 2021 U.S. Dist. LEXIS 173539, at *28–34 (N.D. Cal. Sept. 13, 2021).

Last year, the Tenth Circuit in *Matney* faced a nearly identical claim as Payne's Harbor Fund claim. 80 F.4th at 1149–55. There, the plaintiff alleged that a

---

[16] *See Matousek*, 51 F.4th at 282 (considering fund prospectus); *Davis*, 960 F.3d at 484 n.3 (same); *Meiners*, 898 F.3d at 823 (same).

[17] *See Investments: Explore our Funds*, Dimensional Fund Advisors, https://www.dimensional.com/us-en/funds/ (last visited Apr. 23, 2024).

cheaper share class was available for a fund in the plan. *Id.* at 1149–50. In affirming dismissal of this claim, the Tenth Circuit relied on ERISA plan disclosures showing that the plan's share class was the net cheapest when revenue sharing was taken into account. *Id.* at 1151. The court held: "where, as here, the Plan has not actually offered a more costly fund—that is, the documents [embraced by] the complaint establish that revenue sharing provided plan participants with a discount—there can be no plausible inference of imprudence." *Id.*

The same is true here. Payne alleges that the Plans' Harbor Fund share class costs 8 basis points more than an alternative share class. Compl. ¶ 39. But the "plan disclosures" that the Eighth Circuit has relied on, *Matousek*, 51 F.4th at 279, show that the Plans' share class refunded 10 basis points of revenue sharing to participants. *See* 2016 Plan Comm'n at 3; Plan A 408(b)(2) Fee Discl. at 1, 3, 6, 8; JEPST Fee 408(b)(2) Discl. at 1, 3, 5, 7, 9. The Plans' share class was the net cheapest:

| Year | Plan Share Class & Expense[18] | Plaintiff's Alternative Share Class & Expense[14] | Expense Differential | Revenue Share to Plan Participants[19] |
|------|------|------|------|------|
| 2018 | HACAX (0.66) | HNACX (0.58) | 0.08 | 0.10 |
| 2019 | HACAX (0.66) | HNACX (0.58) | 0.08 | 0.10 |
| 2020 | HACAX (0.67) | HNACX (0.59) | 0.08 | 0.10 |
| 2021[20] | HACAX (0.67) | HNACX (0.59) | 0.08 | 0.10 |

[18] Compl. ¶ 39.

[19] 2016 Plan Comm'n at 3; Plan A 408(b)(2) Fee Discl. at 1, 3, 6, 8; JEPST Fee 408(b)(2) Discl. at 1, 3, 5, 7, 9.

[20] The Harbor Fund was removed from the Plans' investment lineup in 2021. *See* Compl. ¶ 39. *Compare* Plan A Prospect. at 31 (2021), *with id.* at 18 (2018); *compare also* JEPST Forms 5500 at 35 (2021), *with id.* at 20 (2018).

Just like in *Matney*, "there can be no plausible inference of imprudence" because documents embraced by the complaint "establish that revenue sharing provided plan participants with a discount" such that the Plans did "not actually offer[] a more costly fund." 80 F.4th at 1151.

Payne cannot avoid dismissal by claiming a "golden ticket past a motion to dismiss" via "mere allegations" that "cheaper" share classes were available. *Forman*, 40 F.4th at 453. Courts, including the Tenth Circuit in *Matney*, have dismissed share class claims when the challenged fund was the net cheapest after accounting for revenue sharing. 80 F.4th at 1151. Though reaching that same conclusion here requires the Court to consider Plan disclosures, Eighth Circuit precedent directs the Court to do so. The Eighth Circuit itself has relied on "plan disclosures" when affirming the dismissal of ERISA claims in *Matousek* and *Davis*. *See* 51 F.4th at 279, 282; 960 F.3d at 484–86 & n.3.

Although the Eighth Circuit and other courts have allowed some share class claims to proceed past motions to dismiss, those cases are distinguishable. In *Davis* and *Braden*, for example, the Eighth Circuit allowed such claims past motions to dismiss because the defendant offered only "speculation" that the plan "*could have* chosen funds with higher fees" for revenue-sharing purposes. *Braden*, 588 F.3d at 597 (emphasis added); *see Davis,* 960 F.3d at 483 (similar). Likewise, the District of Minnesota has allowed certain share class claims past motions to dismiss in cases in which the court was asked to look at service provider contracts beyond the scope of the "plan disclosures" reviewed in *Matousek* and *Davis*.[21] Here, the "plan

---

[21] *E.g.*, *Keller v. North Memorial Health Care*, No. 22-cv-1794-JWB-JFD, ECF No. 50, (D. Minn. Mar. 6, 2023) (granting in part and denying in part motion to dismiss

disclosures" themselves show that the Harbor Fund was the net cheapest after accounting for revenue sharing. *See* 2016 Plan Comm'n at 3; Plan A 408(b)(2) Fee Discl. at 1, 3, 6, 8; JEPST Fee 408(b)(2) Discl. at 1, 3, 5, 7, 9.

In sum, the Plans' share class of the Harbor Fund was the net cheapest, negating any inference of fiduciary imprudence. *Matney*, 80 F.4th at 1149.

## IV.     The Court should dismiss the Board of Directors

Finally, even if Payne had a plausible claim, the Court should dismiss the Hormel Food Corporation's Board of Directors (the "Board") because Payne has not properly alleged that the Board is a proper defendant. To assert an ERISA breach of fiduciary duty claim against the Board, Payne must plausibly allege that the Board is an ERISA fiduciary—that is, that the Board has discretionary authority over administration of the Plans. *See Pegram v. Herdrich*, 530 U.S. 211, 226 (2000); 29 U.S.C. § 1002(21)(A). That requires more than mere legal conclusions, but factual allegations plausibly suggesting that the Board "was acting as a fiduciary . . . when taking the action subject to complaint" *Pegram*, 530 U.S. at 226.

Payne alleges no facts plausibly suggesting that the Board is responsible for Plan management. All he alleges is that the Board "consists of persons authorized or otherwise entrusted to make discretionary decisions with regard to the Plans' investments," claiming that the Board "had discretion to select or reject the Plans' investments." Compl. ¶¶ 9–10. Those conclusory allegations do not pass muster under *Twombly*. 550 U.S. 544, 555 (2007).

---

from the bench); *Schave v. CentraCare Health Sys.*, No. 22-cv-1555 (WMW/LIB), 2023 U.S. Dist. LEXIS 13786, at *11–13 (D. Minn. Jan. 27, 2023).

In fact, Plan documents demonstrate that the Board does not have fiduciary authority over administering Plan investments. Both Plans assign responsibility for determining Plan investments (subject to further delegation) to a committee of Hormel employees known as the Employee Benefits Committee. *See* Plan A at 2–3 (providing that the "Committee" is responsible for determining the investments in the Plans); JEPST Plan at 2–3 (same). The Committee is appointed by Hormel. *See* Plan A at 4; JEPST Plan at 4. Thus, because the Board is not responsible for administering Plan investments and because there is no allegation that the Board appoints the Committee members, Plaintiff cannot state an ERISA breach of fiduciary duty claim again the Board. *See, e.g.*, *Luense*, 541 F. Supp. 3d at 510 (dismissing ERISA fiduciary claim against a board where the complaint was "devoid of plausible allegations that any individual member of the Board possessed or exercised discretionary authority" over plan administration).

## CONCLUSION

The Court should dismiss the Complaint in its entirety with prejudice.

Dated: April 24, 2024                    DORSEY & WHITNEY LLP

By: */s/ Andrew Holly*
    Andrew Holly (#308171)
    holly.andrew@dorsey.com
    Nicholas J. Bullard (#0397400)
    bullard.nick@dorsey.com
    Brock Huebner (#0402698)
    huebner.brock@dorsey.com
50 South Sixth Street, Suite 1500
Minneapolis, MN 55402
Telephone:  (612) 340-2600

Facsimile:  (612) 340-2868

*Attorneys for Defendants*