UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Scott Payne, individually and on behalf of all others similarly situated,<br><br>    Plaintiff,<br><br>v.<br><br>Hormel Foods Corp.; the Board of Directors of Hormel Foods Corp.; and John Does 1-40,<br><br>    Defendants. | Court File No. 0:24-cv-545-SRN-DTS<br><br><br>**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS** |

## I.  Introduction

This putative class action alleges that Defendants, the fiduciaries of certain defined-contribution benefit plans (the Plans), breached their fiduciary duties under ERISA with imprudent investment selections. As the Eighth Circuit has acknowledged, these duties sweep broadly and are among "the highest known to law." *See Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) (quoting *Donovan v. Bierwirth*, 608 F.2d 263, 272 n. 3 (2d Cir. 1982)).

Plaintiff asserts that Defendants breached their fiduciary duties in two ways: (1) by selecting and retaining underperforming stable value investments; and (2) by selecting and retaining share classes in certain investments when the Plans could have pressed for less costly share classes.

Regarding the stable value investments, Plaintiff offered detailed allegations about Defendants selection and retention of riskier MassMutual general-account stable value

funds when less risky, better-paying stable-value options were available. To establish that Defendants had better-paying options, Plaintiff offers specific allegations about better-paying stable-value investments from MassMutual, as well as similar stable-value funds from an external vendor. As several courts have ruled, such allegations state a claim for fiduciary breach. *See, e.g., Coppel v. Seaworld Parks & Entertainment.* No. 21-1430, 2023 WL 2942462 at *17 (S.D. Cal. Mar. 22, 2023); *Moler v. University of Maryland Medical Sys.*, No. 21-1824, 2022 WL 2756290 at *5-*6 (D. Md. July 13, 2022); *Miller v. Autozone, Inc.*, No. 19-2779, 2020 WL 6479564 at *5 (W.D. Tenn. Sept. 18, 2020); *Disselkamp v. Norton Healthcare, Inc.*, No. 18-48, 2019 WL 3536038 at *8 (W.D. Ky. Aug. 2, 2019).

Plaintiff also offers detailed allegations about Defendants' failure to select lower-cost share classes, which under well-established law from the Eighth Circuit and this District, amply states a claim for breach of fiduciary duty. *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 595–96 (8th Cir. 2009). Rather than accepting this case law, Defendants look beyond this jurisdiction and imply pleading standards that distort the standard of review and go far beyond what the Eighth Circuit requires.

Recycling an argument that repeatedly failed in this District, Defendants contend that revenue-sharing proceeds make up the added cost of more expensive share classes. Contrary to what Defendants suggest, the record does not support that conclusion. But even if it did, this District has correctly rejected efforts to litigate the issue on the pleadings. Based on matters of public record—and other documents, whether "embraced" by the pleadings or not—there are unsettled questions about whether revenue-sharing proceeds

2

actually flowed to participants. For these reasons, Defendants' motion to dismiss must be denied.

## II.      Factual Background

This case involves two defined contribution benefit plans (collectively the Plans) sponsored by Hormel Foods for the benefit of its employees: the Hormel Foods Corporation Tax Deferred Investment Plan A, formed in 1986, now with approximately $796 million in assets; and the Hormel Foods Corporation Joint Earnings Profit Sharing Trust, formed in 1955, now with approximately $446 million in assets. (Compl. ¶¶ 16, 17.) With more than a billion dollars in assets under management, these Plans wield considerable negotiating leverage. (*Id.* ¶¶ 18, 31, 37.)

The main question in this lawsuit is whether Defendants breached their fiduciary duty through imprudent selection and/or monitoring of investments. Plaintiff has identified two central violations: first, selection and retention of a stable-value fund; and second, selection and retention of more expensive share classes for certain mutual funds when less expensive, substantially identical share classes were available.

## A.      Stable Value Investments

With regard to stable-value, the parties agree that the fundamental purpose of such stable-value investments is to preserve principal, avoid loss of value versus inflation over time, and shield principal from risks of loss. (*See* Compl. ¶¶ 21, 32.) While stable-value investments can be organized in different ways, such as guaranteed investment contracts (GICs) or annuities, all stable-value investments have the same basic purpose and function: the preservation of principal.

3

GICs offer a contractually guaranteed rate of return or "crediting rate" during a specified period. (Compl. ¶ 22.) Unlike the highly detailed disclosures associated with mutual funds, when insurance companies provide GICs and other stable-value investments, those providers are not required to specifically disclose how GICs are operated or how underlying assets are accounted or managed. In particular, they may omit details regarding asset allocations, administrative fees and costs, and other material terms. (*See generally* Moriarity Decl., Ex. A at *5-*6 (attaching Advisory Council on Employee Welfare and Pension Benefit Plans [U.S. Department of Labor], *Advisory Council Report on Stable Value Funds and Retirement Security in the Current Economic Conditions* (2009) at *5-*6) (hereinafter ERISA Council Report).)

General account GICs, and the insurer's ultimate payment obligations, and backed by the insurer's unrestricted general accounts, and are therefore generally subject to claims and liabilities against the insurer. (Compl. ¶ 23.) If the insurer fails, no other entity will satisfy the loss to a general account GIC. (*Id.*) Insurers also earn "spread" equal to the difference between the crediting rate and the returns the insurer earns on the funds in its general accounts. (*See* Compl. ¶ 25.)

Defendants offer no evidence that sheds further light on the MassMutual general-account GICs. Most tellingly, even though Plaintiff specifically identified the GICs in his pleadings, Defendants have not supplied the *contracts* (the "C" in GICs) that actually form the basis for the GICs. Defendants instead offer a weblink to a three-page factsheet, which notably lacks specific details about any of the GICs between Hormel and MassMutual (or its successors). (*See* Moriarity Decl., Ex. B.)

4

This factsheet corroborates what Plaintiff alleged about the MassMutual general-account GICs:

- MassMutual's GIC obligations are backed by its unrestricted general accounts. (*Compare* Moriarity Decl., Ex. B at *1 ("[P]articipant principal and interest are backed by *the entire general account assets* of Empower Annuity Insurance Company of America (EAICA)." (emphasis added)), *with* Compl. ¶ 23.)

- MassMutual does not charge fees for its GICs, but instead retains "spread" between its crediting rate and the earnings in its general accounts. (*Compare* Moriarity Decl., Ex. B at *1 ("There is no fee … [EAICA] retains the difference, if any, between the GIA crediting rate and the earnings rate of the applicable portion of its general account, which is referred to as 'spread.'"), *with* Compl. ¶¶ 25, 28.)

Other than establishing a minimum crediting rate, the factsheet says nothing more about how the crediting rate is determined or the purported liquidity of funds invested in the GICs. (*See id.*) The factsheet further confirms that, because GICs are not securities, there is no prospectus for the MassMutual general-account GICs. (*See id.* at *3.)

Defendants also do not dispute that stable-value investments encompass separate-account GICs, meaning GICs that are backed by a separate account and are therefore less susceptible to claims and liabilities against the insurer. (Compl. ¶ 24.) Because separate account GICs are less susceptible to single-entity risk than general account GICs, they typically have lower crediting rates than general account GICs. (*See* Compl. ¶ 26.)

Here the Plans selected general-account GICs from MassMutual. Not only were these GICs *riskier* than separate-account GICs, they also paid a lower crediting rate than

*MassMutual* separate-account GICs. (Compl. ¶ 27.) Because less risky, better-paying GICs were available from the exact same insurer, these allegations plausibly and strongly support the inference that Defendants did not adequately select or monitor these investments. And because Defendants were responsible for Plans with $1.2 billion under management, they had the leverage to demand higher crediting rates and procure stable-value investments that better hedged against inflation. (*See* Compl. ¶ 31.)

Defendants' inattention worked significant, lasting harm to the Plans' participants. Had Defendants even pressed for crediting rates equivalent to what MassMutual offered its customers for separate-account GICs, the participants would have earned another 0.71% to 1.58% per year. (*See* Compl. ¶ 28.) Defendants also could have demanded superior stable-value investments, whether MassMutual separate-account GICs or annuities from other insurers. (*See id.* ¶¶ 27-31.) Had Defendants looked beyond MassMutual to annuities like the TIAA-CREF Traditional Annuity,[1] the participants could have seen increased rates ranging up to 4.00% per year. (*See id.* ¶ 29.)

---

[1]    According to the MassMutual factsheet (cited by Defendants), the MassMutual general-account GICs are "a general account product offered through a group annuity contract." (*See* Moriarity Decl., Ex. B at *1.) TIAA-CREF likewise characterizes its Traditional Annuity as an "annuity contract" and a "guaranteed insurance contract." (*See* Moriarity Decl., Ex. C at *2.) The MassMutual general-account GIC and the TIAA-CREF Traditional Annuity are also similar in that both have a minimum guaranteed rate between 1% and 3%. (*Compare* Moriarity Decl., Ex. B at *1 ("In no event will the guaranteed rate be less than the minimum guaranteed rate, which will be no less than 1% or more than 3%….", *with* Moriarity Decl., Ex. C at *3-*4 ("The minimum guaranteed rate … will be between 1% and 3%[.]").) To the extent Defendants imply differences between these stable-value investments, those differences appear semantic, not substantive.

Given these ongoing harms, Plaintiff accordingly alleges that Defendants breached their fiduciary duties by failing to monitor or remove the underperforming general account GIC. (*See* Compl. ¶¶ 28-29.) Because crediting rates are established by contract and/or reset periodically, the performance of GICs is much more predictable than other investment options, such as mutual funds. (*See id.* ¶ 22.) In this context, it is reasonable to infer that Defendants breached their duties by failing to monitor and redress the ongoing, serious underperformance of the Plans' stable-value investments over a seven-year period.

**B.    Share Class**

To reiterate the share class violations, Plaintiff alleges that Defendants improperly selected more expensive share classes when the Plans were large enough to qualify for less expensive share classes. On their motion to dismiss, Defendants have not contested that for the two challenged funds at issue—the DFA Fund and the Harbor Fund[2]—their respective providers offered multiple share classes of substantially identical mutual funds.

As alleged in the Complaint, mutual fund share classes are identical in all material respects except for cost. (*See* Compl. ¶ 35.) For the DFA Fund, Defendants picked the more expensive DFLVX share class when they could have saved 0.13% to 0.14% with the DFUVX share class. For the Harbor Fund, Defendants picked the more expensive HACAX

---

[2]    As alleged in the Complaint, the challenged funds are the Dimensional Fund Advisors USA Large Cap Value Fund and the Harbor Capital Appreciation Fund. (*See* Compl. ¶ 39.) For the purposes of Defendants' motion to dismiss and consistent with the usage in their motion, Plaintiff will likewise refer to those funds as the "DFA Fund" and the "Harbor Fund." Plaintiff acknowledges a clerical error in the Complaint regarding the share classes for the DFA Fund, and that references to the "DFLUX" share class should have been to the "DFUVX" share class.

share class when they could have saved 0.08% with the HNACX share class. (*See id.* ¶ 39.) Defendants' failure to monitor these investments, or to press for a less expensive share class that would allow a substantially identical investment at lower cost, establishes a breach of fiduciary duty.

With regard to the DFA Fund, Defendants counter they did not have the ability to press for the less expensive DFUVX share class. In support of that argument, they cite the DFUVX prospectus, arguing the Funds could not purchase from DFUVX without being "approved by the Advisor" (Doc. No. 14-1 at *82)—which is to say, without approval from DFA itself.

Defendants' argument, however, hinges on factual disputes that cannot be resolved on the pleadings. The DFLVX syllabus states:

> Shareholders that invest in the Portfolio through a financial intermediatory should contact their financial intermediary regarding purchase and redemption procedures. The Portfolio generally is available for investment only by institutional clients, clients of registered investment advisors, clients of financial institutions and a limited number of certain other investors as approved from time to time by the Advisor. *All investments are subject to approval of the Advisor.*

(Doc. No. 14-1 at *79 (emphasis added).) By comparison, the DFUVX syllabus states:

> Shares of the portfolio are sold only (i) to deferred compensation plans which are exempt from taxation under section 401(k) of the Internal Revenue Code …, (ii) to clients of certain financial advisors, and (iii) to other institutional clients, *in each case as approved by the Advisor*.

(*Id.* at *82 (emphasis added).) Contrary to what Defendants imply, DFA must "approve" sale from either share class. Defendants offer no further details about what the approval

process entails—but no matter what that process is, it cannot be inferred or conclusively resolved on the pleadings.

With regard to the Harbor Fund, Defendants cite "plan disclosures" purportedly showing that excess fees from the HACAX share class were made up by proceeds from revenue-sharing agreements. But this argument rests on untested assumptions: not only that the disclosures reported all revenue-sharing payments from the Harbor Fund, but also that revenue-sharing proceeds were ultimately remitted to the Plans' participants. The record, even with extra documentation from Defendants, does not support those conclusions.

Defendants rely in part on a "2016 Plan Communication" (cited in Defendants' brief as "2016 Plan Comm'n" and found at Notermann Declaration, Exhibit I). Not only does this document predate the time period at issue in this case—approximately two years *before* the class period alleged in the complaint (Compl. ¶ 42)—it only alludes to the existence of revenue-sharing and summarily states that the funds will "be used to pay the Plan's basic administrative/recordkeeping expenses and investment consulting fees." (*See* Doc. No. 15-1 at *131.)

There is no reason to assume that the disclosures in the 2016 Plan Communication are true. More specifically, the communication does not provide an accounting of revenue-sharing proceeds, whether received from the Harbor Plan or any other source. Perhaps more importantly, the 2016 Plan Communication implies that revenue-sharing was used by the Plans for administrative purposes, and not necessarily for the benefit of participants who invested in the Harbor Fund. If anything, the communication undermines the assumption

that revenue-sharing proceeds were *only* used to offset increased costs for participants in the Harbor Fund.

Defendants also cite Rule 408(b)(2) disclosures that purport to show how revenue-sharing proceeds from the Harbor Fund were spent (cited in Defendants' briefing as "Plan A 408(b)(2) Fee Discl." and "JEPST Fee 408(b)(2) Discl.," found at Notermann Decl. Exs. G, H). As stated on their face, these documents are "not intended for distribution to plan participants." (*See* Doc. No. 15-1 at *110-*129.) For the same reason, these disclosures are not cited or discussed in the Complaint, much less "embraced" by it.

Defendants offer no foundation for the Rule 408(b)(2) disclosures. Assuming they accurately report receipt of revenue-sharing proceeds by the Plans' recordkeeper, they supply no other details about how those proceeds were spent. As with the 2016 Plan Communication, this report does not support a conclusive finding that these proceeds offset increased costs to participants in the Harbor Fund.

### III.    Argument

**A.    Under the standard of review, this Court must construe the pleadings with all reasonable inferences for Plaintiff, and this Court cannot accept the truth of representations made in extrinsic documents.**

**1.    The standard of review requires that the allegations in the Complaint be taken as true and construed with all reasonable inferences for Plaintiff, and it does not demand that he allege matters that are systemically in Defendants' possession.**

To defeat a motion to dismiss for failure to state a claim under Rule 12(b)(6), a plaintiff must allege sufficient facts to state a facially plausible claim for relief. *See, e.g.*, *Finlay v. MyLife.com Inc.*, 525 F. Supp. 3d 969, 976 (D. Minn. 2021) (Nelson, J.) (quoting

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The factual allegations need not be detailed, but there must be enough information to raise the plaintiff's right to relief above the speculative level. *See, e.g.*, *Finlay*, 525 F. Supp. 3d at 976 (quoting *Bell Atlantic Corp.* at 570).

When assessing plausibility, a court does not weigh probabilities, but instead considers whether there are enough facts to raise a reasonable expectation that discovery will reveal evidence of wrongdoing. *See, e.g.*, *McDonough v. Anoka County*, 799 F.3d 931, 945 (8th Cir. 2015) (quoting *Bell Atlantic Corp.*, 550 U.S. at 556). Rather than parsing the allegations into pieces to determine whether each one is individually plausible, the complaint should be read as a whole and evaluated in its entirety. *See, e.g., Larson v. Allina Health System*, 350 F. Supp. 3d 780, 790 (D. Minn. 2018) (Nelson, J.) (quoting *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 592 (8th Cir. 2009)).

On a motion to dismiss for failure to state a claim, a court accepts the truth of all factual allegations in the complaint and views them in the light most favorable to the plaintiff. *See, e.g.*, *Ewald v. Royal Norwegian Embassy*, 902 F. Supp. 2d 1208, 1212 (D. Minn. 2012) (Nelson, J.). The standard of review does not demand that plaintiffs plead facts "which tend systemically to be in the sole possession of defendants[.]" *See Krueger v. Ameriprise Financial, Inc.*, No. 11-2781, 2012 WL 5873825, at *7 (D. Minn. Nov. 20, 2012) (Nelson, J.) (quoting *Braden*, 588 F.3d at 598).

**2.    While this Court may consider matters of public record and materials embraced by the Complaint, the record must still be construed with**

> **reasonable inferences for Plaintiff, and this Court cannot accept the truth of any representation in extrinsic documents.**

Besides allegations in the complaint, a court may also consider exhibits to the complaint, other materials embraced by the complaint, and matters of public record. *See, e.g.*, *City of Lake Elmo v. 3M Co.*, 237 F. Supp. 3d 877, 885 (D. Minn. 2017) (quoting *Illig v. Union Elec. Co.*, 652 F.3d 971, 976 (8th Cir. 2011)). But to the extent such documents create factual disputes regarding the Plans or Defendants' fiduciary processes, these factual disputes are not properly considered or resolved on a motion to dismiss. *See, e.g.*, *Becker v. Wells Fargo & Co.*, No. 20-2016, 2021 WL 1909632 at *7 (D. Minn. May 12, 2021) ("Defendants' reliance on the Documents to create factual disputes is improper at this stage[.]").

Consistent with that standard, Plaintiff has no reason to question public documents Defendants included with their motion, such as the prospectuses for various investment funds and the Form 5500s that the Plans filed with the Department of Labor.

That standard also requires this Court to exclude non-public documents like the Rule 408(b)(2) disclosures. There are no allegations in the complaint that describe or discuss them—nor could there be, as they did not become public until Defendants submitted them with their motion to dismiss. The confidential and non-public nature of these documents is plainly evident from the labels "for sponsor use only in meeting fiduciary obligations" and "not intended for distribution to plan participants[.]" (*See* Doc. No. 15-1 at *110-*129.)

If the Rule 408(b)(2) disclosures properly part of the record at all, they should only be considered for the fact that they contain statements about governance of the Plans. They

should not be considered for the *truth* of those statements: such documents cannot supply

conclusive evidence that documents are truthful or that a party has complied with its terms.

*Cf. Savage v. Sutherland Global Servs., Inc.*, 521 F. Supp. 3d 308, 316 (W.D.N.Y. 2021)

(holding that judicially noticed plan documents can only be accepted "for the fact that they

contain a statement … but not to prove the truth of the statement") (quotation omitted).

> **3.**      **To state a claim for a breach of fiduciary duty under ERISA, Plaintiff can establish breaching conduct circumstantially, with imprudent fiduciary conduct reasonably inferred from Defendants' conduct or inaction in selecting investments.**

The fundamental purpose of ERISA is "to prevent through private civil litigation

'misuse and mismanagement of plan assets[.]'" *See, e.g., Larson*, 350 F. Supp. 3d at790

(D. Minn. 2018). Consistent with that intent, ERISA grants participants an important role

in enforcing fiduciary duties. *See Braden*, 588 F.3d at 598.

To assert a claim for breach of fiduciary duty under ERISA, a plaintiff must allege

that (1) defendants acted as fiduciaries; (2) defendants breached their fiduciary duties; and

(3) the breach caused losses to the plan. *See, e.g., Braden*, 588 F.3d at 594; *Parmer v. Land

O'Lakes, Inc.*, 518 F. Supp. 3d 1293, 1302 (D. Minn. 2021). Through their motion to

dismiss, Defendants dispute whether Mr. Payne pleaded that the Board of Directors acted

as a fiduciary and, as to the remaining Defendants, that they breached their fiduciary duties.

**B.**      **Plaintiff plausibly states a claim for relief against the Board of Directors by alleging the Board exercised discretionary authority or responsibility in the management or administration of the Plans.**

ERISA defines a fiduciary as a person who "exercises any discretionary authority

or discretionary control respecting management of [a] plan or exercises any authority or

control respecting management or disposition of its assets," or who "has any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002(21)(A)(i), (iii).

Even if a person is not specifically designated as a fiduciary in plan documents, if that person has authority to exercise discretion over plan management, then that person is a fiduciary—whether or not the person actually exercises such discretion. *Board of Trustees of Western Lake Superior Piping Indus. Pension Fund v. American Benefit Plan Administrators, Inc.*, 925 F. Supp. 1424, 1429 (D. Minn. 1996) (quoting *Olson v. E.F. Hutton*, 957 F.2d 622, 625 (8th Cir. 1992)).

More specifically, when a board of directors appoints plan managers or oversees plan operations, then board members are fiduciaries subject to individual liability for breach. *See, e.g., Bowers v. Russell*, — F. Supp. 3d —, 2024 WL 637442 at *5 (D. Mass. 2024); *see also Placht v. Argent Trust Co.*, No. 21-5783, 2022 WL 3226809 at *7 (N.D. Ill. Aug. 10, 2022) (observing that plaintiff would not have information about corporate officers' roles and was not required to allege their involvement in ERISA breach with greater specificity).

Plaintiff alleges that the "Board of Directors had discretion to select or reject the Plans' investments[.]" (Compl. ¶ 10.) Because the Plans were established and sponsored by Hormel Foods Corporation, it is reasonable to infer that the Plans' investment decisions were either done at the direction of or with approval from the Hormel Foods Board. Taking all reasonable inferences for Plaintiff, the Complaint plausibly alleges the board members exercised some level of discretionary authority or control with regard to management of

14

the Plans. This establishes that board members were fiduciaries under ERISA, precluding dismissal of the board members on that basis.

Patently contradicting the Complaint, Defendants counter that board members had no such discretion and that it was fully delegated to an Employee Benefits Committee. To support that position, Defendants cite two plan documents, which its briefing characterizes as "official plan documents." (*See* Doc. No. 13 at *9 (citing Notermann Decl., Exs. A, B).)

Not only are those "official documents" incomplete, the first page of each document states they are "not … an official legal document under which the Plan[s are] maintained." (*See* Doc. No. 17-1 at *2, *13.) The plan documents are not "embraced" by the complaint and accordingly cannot be considered on this motion to dismiss. These partial, unofficial plan documents also do not conclusively demonstrate that Hormel board members fully relinquished all discretion over the Plans' operations. There is no reason these documents should be considered at all, much less under the standard of review governing a motion to dismiss. These are sound reasons to reject Defendants' argument.

**C.     Based on Plaintiff's allegations regarding Defendants' monitoring or retention of stable-value investments and certain mutual fund share classes, Plaintiff has stated a claim for breach of fiduciary duty.**

As defined under ERISA, fiduciary duty encompasses duties of loyalty and prudence. The Eighth Circuit characterized these duties as "the highest known to the law." *See Braden*, 588 F.3d at 598 (quoting *Donovan v. Bierwirth*, 680 F.2d 263, 272 n. 8 (2d Cir. 1982)).

The duty of prudence requires fiduciaries to carry out their duties "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man

acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims[.]" 29 U.S.C. § 1104(a)(1)(B); *Davis v. Washington University in St. Louis*, 960 F.3d 478, 482 (8th Cir. 2020). As Defendants correctly observe, the duty of prudence is determined objectively, focusing on the process by which the fiduciary makes decisions rather than the results. *See, e.g., Davis*, 960 F.3d at 482 (8th Cir. 2020).

On a motion to dismiss for failure to state a claim, the pleadings need only allege enough to reasonably infer that the decisionmaking process is flawed. *Davis*, 960 F.3d at 483; *Parmer*, 518 F. Supp. 3d at 1303. Participants "generally lack the inside information necessary to make out their claims in detail unless and until discovery commences." *Braden*, 588 F.3d at 598. Given this lack of inside information, the complaint does not need to specifically describe the decisionmaking process that guided plan management. *Parmer*, 518 F. Supp. 3d at 1303 (quoting *Davis*, 960 F.3d at 483).

"[I]t is sufficient for a plaintiff to plead facts indirectly showing unlawful behavior, so long as the facts pled 'give the defendant fair notice of what the claim is and the ground upon which it rests[.]'" *Braden*, 588 F.3d at 595 (quoting *Erickson v. Pardus*, 551 U.S. 39, 93 (2007)); *see also Larson*, 350 F. Supp. 3d at 793 ("[E]ven when the complaint does not allege facts showing specifically how the fiduciaries breached their duty … a claim can survive a motion to dismiss if the court may reasonably infer that the fiduciaries engaged in a flawed decision-making process.").

Circumstantial allegations, *with flawed fiduciary process inferred from investment choices the fiduciaries made*, can be enough to state a claim. *See, e.g., Davis*, 960 F.3d at

483 ("[C]ircumstantial allegations about [the fiduciary's] methods based on the investment choices a plan fiduciary made can be enough.") (quotation omitted).

> 1. **By alleging that Defendants continued holding riskier stable-value investments that paid substantially lower crediting rates than what the Plans could have obtained from other sources, Plaintiff states a claim against Defendants for breach of fiduciary duty.**

To state a claim for breach of the duty of prudence, a "'failure of effort [or] competence' is enough." *Davis v. Washington Univ. in St. Louis*, 960 F.3d 478, 483 (8th Cir. 2020) (quoting *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 596 (8th Cir. 2009)). Within the scope of the duty of prudence, a fiduciary must not only exercise prudence when selecting investments, but also has a continuing duty to monitor those selections and remove those that underperform or are too expensive. *See generally Tibble v. Edison Int'l*, 575 U.S. 523, 529 (2015).

> a. **The Complaint alleges specific, plausible details supporting the inference that Defendants selected or retained stable-value investments that were riskier and paid less than other substantially equivalent stable-value options.**

Plaintiff first challenges Defendants' selection of a stable value fund. Defendants do not contest that stable-value funds "can generally be labeled as a conservative, fixed income investment vehicle with an objective of preserving capital while providing a relatively stable rate of return." (*See* Doc. No. 14-1 [Bullard Decl., Ex. 6] at *99.)[3]

---

[3]   Because Defendants did not file the ERISA Council Report in its entirety (Doc. No. 14-1 [Bullard Decl., Ex. 6] at *97-*104)), Plaintiff submits this report (Advisory Council on Employee Welfare and Pension Benefit Plans, *Advisory Council Report on Stable Value Funds and Retirement Security in the Current Economic Conditions* (2009)) through Exhibit A of the Declaration of Scott Moriarity.

When evaluating whether plan fiduciaries have met their obligations with regard to the selection and monitoring of stable value funds, their duties differ from those for other types of investments. The central concerns are whether the stable-value fund adequately shields principal from risk of loss and whether participants receive a reasonable crediting rate from that fund.

When fiduciaries failure to monitor crediting rates or the "spread" an insurer earns on stable-value investments, participants earn less and the insurer may be pocketing an unreasonable share of the proceeds. Because insurers typically retain "spread" in lieu of fees, fiduciaries should regularly monitor spread and check that insurers are not receiving unreasonable compensation for stable-value investments. On a basic level, this means that fiduciaries should check crediting rates against other stable-value products. *See generally Disselkamp v. Norton Healthcare, Inc.*, No. 18-48, 2019 WL 3536038 at *5-*7 (W.D. Ky. Aug 2, 2019).

Through the Complaint, Plaintiff offers detailed allegations regarding Defendants' failure to adequately monitor the Plans' stable-value investments. This failure is shown by Defendants' selection and retention of the riskier MassMutual general-account stable value fund over less risky MassMutual separate-account funds with substantially higher crediting rates. (Compl. ¶¶ 27, 28.) This failure is further shown by Defendants' failure to consider much higher crediting rates available elsewhere, whether from MassMutual itself or from external vendors like TIAA-CREF. (*Id.* ¶¶ 28, 29, 30, 31, 33.)

Had Defendants checked crediting rates of the MassMutual general-account fund against other MassMutual products or outside vendors, participants could have earned

18

drastically higher returns, ranging from 0.71% to several percentage points. (Compl. ¶¶ 27, 28, 32, 33.) Based on Defendants' failure to assess and monitor the Plans' stable-value selections, followed by substantial losses to Plan participants, the Complaint plausibly alleges that Defendants failed to prudently manage or monitor the stable-value investments.

> **b. Other courts, considering equally detailed pleadings, have found plausible breaches of fiduciary duty arising out of the selection or management of stable-value investments.**

Other federal courts, examining similar allegations about stable-value investments, have found a plausible claim for breach of fiduciary duty. For instance, in *Disselkamp v. Norton Healthcare, Inc.*, the Western District of Kentucky examined a plan that selected a general-account stable value fund. No. 18-48, 2019 WL 3536038 (W.D. Ky. Aug. 2, 2019).

In that case, plaintiffs alleged that fiduciaries failed to monitor the fund, in part because the general-account fund was not adequately diversified, and in part because of a low crediting rate with excessive spread to the insurer. To establish a low crediting rate with excessive spread, plaintiffs offered allegations about other stable-value investments that offered higher crediting rates. And plaintiffs further alleged that, because the insurer was also the plan recordkeeper, fiduciaries had further reason to scrutinize the stable-value investments and assess whether the recordkeeper was lowballing the crediting rate at participants' expense. 2019 WL 3536038 at *6-*7.

The *Disselkamp* court concluded that plaintiffs had stated a claim. In reaching that conclusion, the court reiterated plaintiffs' allegation that "a defining feature of a stable fund is its stability." *Id.* at *8. The court then reasoned, "[I]f a *predictable* investment continues

to chronically underperform, one could draw a conclusion that the fiduciaries overseeing the fund have breached that duty." *Id.* (emphasis added)

The factual scenario and reasoning in *Disselkamp* can be squarely applied in this Court. Like in *Disselkamp*, Plaintiff has alleged that a general-account stable value fund was not adequately diversified, and that the fund offers a low crediting rate with excessive spread to the insurer. (*See* Compl. ¶¶ 23, 26, 31.) Plaintiff has established the excessive spread through allegations that other stable-value investments offered significantly higher crediting rates. (*See id.* ¶¶ 27, 28.) And like the stable-value fund vendor in *Disselkamp*, here the fund is provided by MassMutual, which also serves as the Plans' recordkeeper.[4] On these allegations, Plaintiff states a breach claim on the stable-value theory. *Cf.* 2019 WL 3536038 at *8.

The reasoning from *Disselkamp* guided the Western District of Tennessee in *Miller v. Autozone, Inc.* No. 19-2779, 2020 WL 6479564 (W.D. Tenn. Sept. 18, 2020). Plaintiffs in that case made similar allegations regarding fiduciaries' failure to monitor or remove general-account GICs, citing single-entity credit risk and excessive spread. In addition, Plaintiffs identified other stable-value investments with higher crediting rates, including better rates from the vendor (in this case Prudential) that supplied the plans with GICs. *See id.* at *5 ("[C]omparable stable value funds were available from other providers with higher

---

[4]     Defendants acknowledge that MassMutual, the vendor that provided the GICs at issue in the Complaint, is also the Plans' recordkeeper. (*See* Def.'s Mem. at 6 n. 7 [Doc. No. 13 at *15 n. 7].)

crediting rates, and … an identical product was available from Prudential with higher crediting rates and lower spread fees.").

Denying a motion to dismiss, the *Miller* court rejected the defendants' arguments about purported differences between various stable-value investments. 2020 WL 6479564 at *7. Accepting the plaintiffs' allegations about the stability and predictability of stable-value investments, the court ruled that plaintiffs stated a claim for imprudent retention of stable-value investments. *See id.* The same reasoning should guide this Court.

Yet another example can be taken from the Southern District of California in *Coppel v. Seaworld Parks & Entertainment.* No. 21-1430, 2023 WL 2942462 (S.D. Cal. Mar. 22, 2023). There the plaintiffs challenged fiduciaries' selection and retention of MassMutual stable-value investments. While this case involved MassMutual separate-account GICs, not general-account GICs, the parties chiefly disputed whether the crediting rates were too low and whether MassMutual retained excessive spread.[5]

Citing Plaintiffs' allegations of substandard crediting rates, as well as indicia that MassMutual captured excessive spread on funds in its stable-value investments, the *Coppel* court ruled that Plaintiffs stated a claim for breach of fiduciary duty. *See* 2023 WL 2942462

---

[5]      Unlike the current motion, the *Coppel* decision is also notable in that the fiduciaries there disclosed an "Investment Agreement" that supplied specific terms for how crediting rates were established. 2023 WL 2942462 at *16 (citing defendants' arguments regarding an "Investment Agreement" with MassMutual, including a crediting rate purportedly based on "the Market Value Account rate of return, the amount and timing of payments out of the fund …, anticipated returns on new investments, [etc.]). Defendants have disclosed nothing like that here, or any other instruments purporting to be "Guaranteed Interest Contracts" between the Plans and MassMutual.

at *16-*17. Like other federal courts confronted with the issue, *Coppel* also rejected the fiduciaries' arguments regarding purported differences between stable value investments, accepting that such investments (including those offered by MassMutual and TIAA-CREF) were "identical or substantially identical." *See id.* at *17. Based on this and the other aforementioned cases, this Court has sound reason to deny Defendants' motion to dismiss.

<strong>c.    Defendants rely on legally flawed decisions that run against established Eighth Circuit authority.</strong>

Against this body of case law, Defendants offer questionable cases in their favor. For instance, *Laabs v. Faith Technologies, Inc.*, wrongly applied comparator analysis to stable-value investments, instead offering misplaced and unsupported statements regarding the plans' purported lack of bargaining power. *Laabs* is also distinguishable in that the pleading alleged a "single comparator," whereas Plaintiff has alleged specific alternatives, both internally through MassMutual and externally through TIAA-CREF. No. 20-1534, 2023 WL 9321358 at *8 (E.D. Wis. Aug. 30, 2023).

Similarly, *LaLonde v. Massachusetts Mutual Insurance Co.*, made factual findings that cannot be reconciled with the standard of review on a motion to dismiss. The court specifically accused the plaintiff of "hindsight-based allegations," finding that *seven years* of substandard crediting rates were not enough to show fiduciaries' inattention to a fund's stable value investments. — F. Supp. 3d —, 2024 WL 1346027 at *9 (D. Mass. Mar. 29, 2024). This ruling contradicts established Eighth Circuit law, which recognizes a flawed fiduciary process can be inferred from poor or inattentive investment decisions. *Cf. Davis*, 960 F.3d at 483 ("[C]ircumstantial allegations about [the fiduciary's] methods based on the

investment choices a plan fiduciary made can be enough.") Given that conflict with Eighth

Circuit law, *Lalonde* does not advance the analysis here.[6]

> **d.    Defendants demand specific details that are not required under Eighth Circuit law and that distort material differences between stable-value investments and other types of investments.**

This case law also reveals two critical differences between stable-value investments

and other types of plan investments. The first critical difference is the relationship between

crediting rate and "spread." Unlike mutual funds, stable-value investments typically do not

charge fees; the vendors instead pay administrative costs (and earn profits) out of "spread"

between the crediting rate and the actual growth of the funds. When "spread" is excessive,

the problem is more akin to excessive fees than substandard fund performance. Because

the crediting rate is fixed, purported differences in asset allocation or investment strategy

do not matter. *Cf. Disselkamp*, 2019 WL 3536038 at *8 (inferring breach where fiduciaries

do not redress "a predictable investment" that "continues to chronically underperform").

The other critical difference is that stable-value investments are not securities at all,

but instead are founded on contractual agreements between fund vendors and benefit plans.

While mutual funds and other securities are required to publicly disclose prospectuses, with

---

[6]    Defendants also repeatedly cite a class certification decision, *Wood v. Prudential Retirement Insurance & Annuity Co.*, from the District of Connecticut. No. 15-1785, 2017 WL 3381007 (D. Conn. Aug. 4, 2017). That case offers no insight on the sufficiency of pleadings and nominal comment on stable-value investments. *Id.* at *1, *3. Perhaps more importantly, the same court previously denied a motion to dismiss claims against an *issuer* of stable-value investments, citing factual disputes over crediting rates and allocation of risk. *See* 2016 WL 5940946 at *4. Because these proceedings are factually and legally distinct, they do not inform Defendants' motion.

detailed information about fees, assets, and investment strategy, no similar requirements

exist for stable-value investments. More simply put, stable-value investments are opaque

compared to other investments: vendors provide few details about spread, liquidity, or the

accounting of the funds. This problem is well illustrated by the fact that, while Plaintiff

repeatedly cited MassMutual GICs in his Complaint, Defendants have not disclosed them

or made them part of the record on this motion to dismiss, instead citing a generic three-

page factsheet.[7]

These critical differences not only inform the record before this Court, they also

reveal significant flaws in Defendants' arguments for dismissal. While Defendants argue a

litany of purported distinctions between various types of stable-value investments, these

distinctions are based on Defendants' incorrect assumption that participants are investing

in securities. Once those incorrect assumptions are dispelled, the distinctions turn out to be

immaterial.

For instance, Defendants emphasize differences between stable-value investments

based on their rates, guaranteed minimums, and risk profiles. The fiduciaries in *Miller* and

*Coppel* mounted a very similar series of arguments, citing specific transactional details

---

[7]     Defendants demand that Plaintiff allege various granular details about stable-value
investments. But through the ERISA Council Report, the Department of Labor
acknowledged that *benefit plans* have difficulty procuring details that are "critical . . . [to]
adequately determine the appropriateness of selecting a particular Stable Value Fund." (*See*
Moriarity Decl., Ex. A at *5-*6; *see also* Doc. No. 14-1 [Bullard Decl., Ex. 6] at *97-*104
(citing the same report).) Given this lack of inside information, the Complaint does not
need to specifically allege what those details are or how they informed Defendants'
decisionmaking process. *See Parmer*, 518 F. Supp. 3d at 1303 (quoting *Davis*, 960 F.3d at
483).

going well beyond the pleadings. *See Miller*, 2020 WL 4679564 at *6-*7; *Coppel*, 2023 WL 2942462 at *16.[8]

Those arguments did not sway the *Miller* or *Coppel* courts, and they should not sway this Court either. As discussed at the outset, the record does not have sufficient information for a detailed technical comparison between stable-value investments. Defendants have not proffered the contracts that form the basis for the MassMutual general-account GICs, and Plaintiff could not possibly supply a pleading that articulates or addresses such technical details. In effect, Defendants demand a level of detail that hails back to code pleading and effectively frustrates claims for breach of fiduciary duty.

When examining stable-value funds, the stakes are fundamentally different than for mutual funds and other risky investments. By comparison, stable-value investments are meant to preserve principal and assure that participants receive a predictable, *contractually promised* rate of return. Because of those common, salient features, the Complaint alleges stable-value investments that fall within the "same peer universe" as the MassMutual general-account GICs. *Cf. Synder v. UnitedHealth Group, Inc.*, No. 21-1049, 2021 WL 5745852 at *3 (D. Minn. Dec. 2, 2021); *see also Moler v. University of Maryland Medical*

---

[8]    Plaintiff disputes whether differences in investment strategy or asset allocation are germane to stable-value investments at all. Assuming such differences are relevant, any related factual disputes are not properly resolved on a motion to dismiss. See, e.g., *Snyder*, 2021 WL 5475852 at *3; *Vellali v. Yale University*, 308 F. Supp. 3d 673, 687 (D. Conn. 2018) (holding that issues regarding suitability of index-fund benchmarks is "not appropriately addressed" on a motion to dismiss); *Prime Healthcare ERISA Litig.*, 2021 WL 3076649 at *6 ("[T]he determination of an appropriate benchmark for a fund is a question not properly resolved at the motion to dismiss stage[.]") (quoting *In re Medstar ERISA Litig.*, No. 20-1984, 2021 WL 391701 at *6 (D. Md. Feb. 4, 2021)).

*Sys.*, No. 21-1824, 2022 WL 2759290 at *5-*6 (D. Md. July 13, 2022) (holding that issues regarding putative comparators to stable-value investment are "not properly resolved on a motion to dismiss").

Citing the Eighth Circuit decision in *Davis v. Washington University*, Defendants also argue that a "prudent fiduciary can offer [participants]" the choice to trade "higher returns for reduced risk and guaranteed income." 950 F.3d 478, 486-87 (8th Cir. 2020). Plaintiffs agree with that principle, but it does not apply to this case. As the Complaint alleges, Defendants did not trade off higher returns for reduced risk; they selected a stable-value investment with *reduced* returns and *higher* risk. (*See* Compl. ¶¶ 31, 33, 34.)

Defendants also dispute whether the Plans had leverage to press MassMutual (or other vendors) for higher crediting rates. On its face, this argument requires this Court to disregard the pleadings and take inferences against Plaintiff. As the Eighth Circuit observed in *Davis*, it is plausible to allege that fiduciaries breached their duties through their failure to leverage plans' size and bargaining power. There is no reason to reject this straightforward inference on the pleadings, nor should this Court be prematurely drawn into factual disputes regarding the Plans' bargaining power. Assuming this dispute has any weight at all, it should be decided after discovery into the merits, not on a motion to dismiss.

For purposes this motion, this Court need not entertain purported differences that do not inform whether Defendants satisfied their fiduciary duties. Because Plaintiff has supplied a detailed and plausible basis for the stable-value theory, Court should accordingly reject Defendants' arguments and deny their motion to dismiss.

2.   **Plaintiff also states a claim for breach of fiduciary duty based on allegations that Defendants selected or retained more expensive share classes over less expensive, substantially identical options.**

a.   **Plan fiduciaries' selection of more expensive share classes, when less expensive share classes were available to the Plans, is a breach of the duty of prudence.**

Plaintiff also asserts that Defendants breached their fiduciary duty by selecting the wrong share classes. When an investment fund offers less expensive share classes, a large plan breaches its fiduciary duty by selecting the more expensive share class.

The rationale is that large plans qualify for identical share classes with lower fees. A breach of fiduciary duty can be reasonably inferred from the large plan's decision not to select an institutional share class with lower fees. *See, e.g., Braden*, 588 F.3d at 595-96 & n. 5; *see also Parmer v. Land O'Lakes, Inc.*, 518 F. Supp. 3d at 1304 (observing that institutional share classes "are no different from investor class shares other than cost"); *Larson v. Allina Health Sys.*, 350 F. Supp. 3d 780, 799 (D. Minn. 2018) (holding that participants stated claim based on selection of retail share class over institutional share class).

This reasoning also finds strong support outside the Eighth Circuit. *See, e.g., Forman v. TriHealth, Inc.*, 40 F.4th 443, 450 (6th Cir. 2022); *Sacerdote v. New York University*, 9 F4th 95, 105-06 (2d Cir. 2021); *Sweda v. University of Pennsylvania*, 923 F.3d 320, 331 (3d Cir. 2019); *Kong v. Trader Joe's Co.*, No. 20-56415, 2022 WL 1125667 (mem.)  at *1 (9th Cir. Apr. 15, 2022); *Dover v. Yanfeng US Automotive Interior Sys. I LLC*, 563 F. Supp. 3d 678, 686 (E.D. Mich. 2021); *Vellali v. Yale University*, 308 F. Supp.

3d 673, 686 (D. Conn. 2018); *Ybarra v. Board of Trustees of Supplemental Income Trust Fund*, No. 17-2091, 2018 WL 9536641 at *4 (C.D. Cal. Nov. 5, 2018).

In accordance with this case law, Mr. Payne amply pleaded a share class violation of the duty of prudence. The Complaint alleges that the Plans, with holdings around $1.2 billion dollars, qualify for lower-cost share classes. (Compl. ¶¶ 35-37.) But when the Plans selected the Dimensional Fund Advisors USA Large Cap Value and Harbor Capital Appreciation funds, the Plans opted for share classes with higher fees, notwithstanding the availability of less expensive share classes. (*Id.* ¶¶ 39, 40.)

The Complaint further alleges that, had the Plans exercised ordinary prudence, they knew or should have known that significantly cheaper share classes were available. As the Complaint explains, "[s]ome share classes are targeted at smaller defined-benefit retirement plans or individual investors, for which the mutual fund company charges higher costs. Other share classes are targeted at larger investment plans, for which the mutual fund company charges lower costs." (Compl. ¶ 35.)

Prudent fiduciaries of large plans know they can use its size to leverage additional bargaining power to demand a less expensive share class and should select the least expensive share class for which the plan qualifies. (*See* Compl. ¶ 36.) When fiduciaries do not select the least expensive share class, it is reasonable to infer they breached their duty of prudence.

As in *Hughes v. Northwestern Univ.*, 63 F.4th 615 (7th Cir. 2023), the pleadings support the inference that the Plans could obtain lower-cost share classes. Consistent with decisions in multiple appellate courts, the court observed,

28

> [Fiduciaries'] alternative explanations about the unavailability
> of institutional-class shares or the advantages of higher
> revenue-sharing payments … could explain [the fiduciaries']
> failure …. But based on the facts pleaded, these alternative
> inferences are not strong enough to overcome the equally, if
> not more, reasonable inference that [the fiduciaries] failed to
> use [the plan's] size to bargain for cheaper institutional shares.
> Drawing these reasonable inferences in plaintiffs' favor, they
> have plausibly alleged … failure to swap out retail-class for
> institutional-class shares was outside the reasonable decisions
> a fiduciary could take.

*Id.* at 636. The same inferences apply in this case. While Defendants may suggest that other

share classes were "unavailable" or undesirable, Plaintiff supplies an equally plausible

inference, that Defendants failed to harness the Plans' size or negotiating power to obtain

cheaper share classes. That precludes dismissal here.

This analysis also disposes Defendants' argument, with regard to the DFA Fund,

that they needed "approval from the Advisor" to get the cheaper share class. As discussed

earlier, DFA reserved "approval" for both share classes at issue in the Complaint, and the

pleadings offer no other details that would shed light on the process. (*See* Doc. No. 14-1 at

*79, *82.) Taking reasonable inferences for Plaintiff, this only indicates a factual dispute

to be resolved through discovery, and it is premature to conclusively determine whether

the Plans had leverage one way or another. *Cf. Hughes*, 63 F.4th at 636.

As pleaded in the Complaint, and as supported by the Eighth Circuit and this District

decisions related to share class violations, it is a breach of fiduciary duty for a large plan

to select more expensive share classes when less expensive share classes are available. *Cf.*

*Braden*, 588 F.3d at 595-96; *Parmer*, 516 F. Supp. 3d at 1304; *Larson*, 350 F. Supp. 3d at

799. Taking all reasonable inferences for Plaintiff, the Complaint has detailed allegations

to support the conclusion this breach occurred. To the extent Defendants attack this theory, their motion to dismiss must be denied.

> **b.    When a share class violation is established on the pleadings, plan fiduciaries cannot obtain dismissal by offering an independent, purportedly legal justification for their actions.**

With regard to the Harbor Fund, Defendants contend that they offset the higher fees of the selected share class through revenue sharing, which allowed them to apply the extra fees to other sources. This argument requires this Court to accept several assumptions about how revenue-sharing was handled, as those practices are tenuously described in the 2016 Plan Communication and the Rule 408(b)(2) disclosures. Such assumptions are untested and cannot be reconciled with the standard of review on a motion to dismiss.

A majority of federal courts accept that reasoning. When plan administrators proffer their own reasons for selecting a retail share class, this does *not* negate an inference of fiduciary misconduct. *See, e.g., Forman v. TriHealth, Inc.*, 40 F.4th 443, 450 (6th Cir. 2022) ("Perhaps the plan has revenue-sharing arrangements that make the retail shares less expensive or that benefit plan participants on the whole. But at the pleading stage, it is too early to make these judgment calls."); *Kong v. Trader Joe's Co.*, No. 20-56415, 2022 WL 1125667 at *1 (mem.) (9th Cir. Apr. 15, 2022) ("Defendants' explanation for the more expensive choice is unavailing at the pleading stage. Though the parties signed a revenue sharing agreement that might provide some explanation … the agreement only shows what could occur in theory—not what occurred in fact.").

And this District has consistently followed suit. *Parmer*, 518 F. Supp. 3d at 1305 (quoting *Braden*, 588 F.3d at 597); *Krueger v. Ameriprise Financial, Inc.*, No. 11-2781, 2012 WL 5873825 at *10 (D. Minn. Nov. 20, 2012) (holding that "it was not the plaintiff's responsibility" to rebut the lawful reasons defendant offered).

When asserting a claim for breach of fiduciary duty, plan participants are not required to anticipate and rule out "all possible lawful explanations" for a plan administrator's decisionmaking.[9] *See, e.g.*, *Braden*, 588 F.3d at 597; *Parmer*, 518 F. Supp. 3d at 1305 (quoting *Braden*); *see also Morin v. Essentia Health*, No. 16-4397, 2017 WL 4083133, at *2 (D. Minn. Sept. 14, 2017) (denying motion to dismiss fiduciary-breach claim based on defendants' proffered "alternate constructions of inferences to be drawn from the facts"), *report and recommendation adopted*, 2017 WL 6876281 (D. Minn. Oct. 27, 2017); *accord*, *Sweda v. University of Pennsylvania*, 923 F.3d 320, 326 (3d Cir. 2019) (citing *Braden*); *Stark v. Keycorp*, No. 20-2154, 2021 WL 1758269 at *6 (N.D. Ohio May 4, 2021) (also citing *Braden*).[10]

---

[9]   *Braden* also observed that, where "the facts … point[ ] to … the result one would expect from lawful conduct *in which the defendant is known to have engaged*[,]" then there may not be a plausible inference of imprudent conduct. 588 F.3d at 597 (emphasis added). But this proposition necessarily assumes the plaintiff had reason to know that the defendant engaged in lawful conduct. Given the absence of discovery into Defendants' recordkeeping agreement or the disposition of any revenue shared between the recordkeeper and the investment fund operators, it is improper to assume that Defendants' conduct is either "known" or lawful.

[10]   Likely due to the strong authority from the Eighth Circuit and this District, Defendants rely heavily on questionable (and distinguishable) decisions from other jurisdictions. *See, e.g., Matney v. Barrick Gold of North America, Inc.*, 80 F.4th 1136,

To the extent Defendants contend they had an arrangement to rebate or adjust fees, the factual details of such an arrangement are not dispositive and cannot supply grounds for a motion to dismiss. *Forman*, 40 F.4th at 452–53 ("Revenue sharing remains 'one plausible inference, but it is not the only one.'") (quotation omitted); *Kong*, 2022 WL 1125667 at *1 ("[T]he agreement shows only what could occur in theory—not what occurred in fact."); *see also Morin*, 2017 WL 4083133 at *6 (rejecting documents "Defendants submitted … explicitly to refute factual allegations" about revenue-sharing), *report and recommendation adopted*, 2017 WL 6876281 (D. Minn. Oct. 27, 2017).

In addition, where a plan purportedly relies on rebates to make up excessive share class fees, but the rebates are not disclosed through public documents like Form 5500s, this signals contested fact issues that preclude dismissal. *See Bouvy v. Analog Devices, Inc.*, No. 19-881, 2020 WL 3448385 at *11 (N.D. Cal. June 24, 2020). Given the silence of Form 5500s on this issue, this is further grounds to deny Defendants' motion.

**D.    Assuming for the sake of argument Plaintiff has not stated any claim or constituent theory for breach of fiduciary duty, he respectfully asks that the**

---

1149–53 (10th Cir. 2023) (accepting defendants' argument, on motion to dismiss, that revenue credit set off excessive fees, relying on non-public plan documents referenced in the complaint); *Johnson v. Parker-Hannifin*, No. 1:21-cv-00256, 2023 WL 8374525, at *9–12 (N.D. Ohio Dec. 4, 2023) (accepting defendants' argument, on motion to dismiss, that plaintiff must allege that the plans "qualified" for lower-fee shares but did not obtain them) *appeal filed*, (6th Cir. Jan. 4, 2024); *Boyette v. Montefiore Med. Ctr.*, No. 22-cv-5280, 2023 WL 7612391 (S.D.N.Y. Nov. 13, 2023) (accepting defendants' argument, on motion to dismiss, that revenue credit set off excessive fees, because the plans' Form 5500s "explain that the Plan received revenue sharing . . . and that such proceeds were credited back to participants investing in those funds").

**claim be dismissed without prejudice and that he be granted leave to replead and cure.**

Assuming for the sake of argument this Court has grounds to dismiss, Plaintiff proposes that such dismissal be without prejudice and with leave to amend. To the extent the pleadings are lacking specific details, that can either be cured through repleading or through discovery, this Court has discretion to dismiss without prejudice. *See, e.g., Miles v. Simmons University*, 514 F. Supp. 3d 1070, 1080 (D. Minn. 2021); *see also Washington v. Craane*, No. 18-1464, 2019 WL 2147062, at *5 (D. Minn. Apr. 18, 2019) ("[C]laims … should therefore be dismissed with prejudice if repleading of the claims would be futile, and dismissed without prejudice where the claims might conceivably be repleaded with success.").

## IV.    Conclusion

For all the foregoing reasons, Mr. Payne respectfully asks that this Court deny Defendant's motion in its entirety.

Dated: May 15, 2024                    Respectfully submitted,

                                       */s* Scott Moriarity
                                       Scott A. Moriarity, #0321977
                                       Shawn J. Wanta, #0389164
                                       Katherine E. Rollins, 0402808
                                       *Attorneys for Plaintiff*
                                       WANTA THOME PLC
                                       100 South Fifth Street, Suite 1200
                                       Minneapolis, MN 55402
                                       Telephone: (612) 252-3570
                                       Fax: (612) 252-3571
                                       samoriarity@wantathome.com
                                       sjwanta@wantathome.com
                                       kerollins@wantathome.com