## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Scott Payne,<br><br>        Plaintiff,<br><br>v.<br><br>Hormel Foods Corp.,<br>The Board of Directors of Hormel Foods<br>Corp., and<br>John Does 1–40,<br><br>        Defendants. | Case No. 24-cv-545 (SRN/DTS)<br><br><br>**ORDER** |

Katherine Rollins, Scott Moriarity, and Shawn Wanta, Wanta Thome PLC, 100 South Fifth Street, Suite 1200, Minneapolis, MN 55402, for the Plaintiff.

Andrew Holly and Brock Huebner, Dorsey & Whitney LLP, 50 South Sixth Street, Suite 1500, Minneapolis, MN 55402, for the Defendants.

SUSAN RICHARD NELSON, United States District Judge

This matter is before the Court on the Defendants' Motion to Dismiss [Doc. No. 10]. Based on a review of the files, submissions, and proceedings herein, and for the reasons stated below, the Court denies the Defendants' motion.

## I.    BACKGROUND

### A.    Facts

Defendants Hormel Foods Corporation, the Hormel Foods Corporation Board of Directors ("the Board"), and the John Doe officers, employees, and contractors of the Hormel Foods Corporation (collectively, "the Defendants" or "Hormel"), sponsor and

operate two retirement plans for Hormel employees: the Hormel Foods Corporation Tax Deferred Investment Plan A ("Plan A"), and the Hormel Foods Corporation Joint Earnings Profit Sharing Trust ("JEPST Plan") (collectively, "the Plans"). (Compl. [Doc. No. 1] ¶¶ 1, 7, 9, 11.) Together, the Plans hold at least $1.2 billion in assets under management. (*Id*. ¶ 18.) The Plans each offer several different investment options, with varying risk levels, which participants may elect. (*See* Plan A Prospectus [Doc. No. 17]; JEPST Plan Prospectus [Doc. No. 17].)[1] The majority of these investment options are not at issue here. (*See generally* Compl.)

Mr. Payne is a participant in the Plans, and has been since at least 2017. (*Id*. ¶¶ 6, 42.) In this putative class action lawsuit, he directs his claims towards two aspects of the Plans: (1) the stable value investment option; and (2) the share classes selected for certain mutual funds. (*Id*. ¶¶ 20, 39.)

### 1.    The Stable Value Investment Option

Insurance companies regularly issue single entity guaranteed investment contracts ("GICs") to retirement benefit plans in the form of fixed-annuity contracts. (*Id*. ¶ 22.) Under the terms of the contracts, the GICs provide for a guaranteed rate of return (the "crediting rate") during a specified period. (*Id*.) GICs can be structured in a number of different ways, depending on the account or accounts backing the guaranty, including as "general account" GICs or "separate account" GICs. (*Id*. ¶¶ 22–24.)

---

[1]    Relevant fund prospectuses are "embraced by the pleadings" and may be considered by a district court on a motion to dismiss. *See Davis v. Washington University in St. Louis*, 960 F.3d 478, 484 n.3 (8th Cir. 2020); *Meiners v. Wells Fargo & Co.*, 898 F.3d 820, 823 (8th Cir. 2018).

One of the investment options offered by the Plans is a MassMutual general account GIC. (*Id*. ¶ 20.) The GIC is offered to plan participants as a stable value investment option, and is intended to provide an option that prioritizes the protection of principal over long-term growth. (*Id*. ¶¶ 20–21; Plan A Prospectus at 3; JEPST Plan Prospectus at 3.) The Plans do not offer any other stable value investment option. (*See* Plan A Prospectus; JEPST Plan Prospectus).

General account GICs, like the one offered in the Plans, are backed by the issuing entity's unrestricted general investment accounts. (Compl. ¶ 23.) Accordingly, the Plans' GICs are subject to any claims and liabilities asserted against MassMutual, and the risk that, if MassMutual fails, no other entity will satisfy the loss to the Plans. (*Id*.) Because the GICs are backed by assets within MassMutual's unrestricted general accounts, MassMutual earns a "spread" equal to the difference between returns from its general accounts and the GIC's crediting rate. (*Id*. ¶ 25.)

Separate account GICs, by contrast, are structured with backing from a separate investment account, established by the entity issuing the GIC. (*Id*. ¶ 24.) The separation serves to insulate the assets from claims and liabilities against the insurance company. (*Id*.) Separate account GICs, therefore, are considered lower risk than general account GICs, and typically have correspondingly lower crediting rates. (*Id*. ¶ 26.) MassMutual establishes the crediting rates for its GICs, and offers both general account GIC and separate account GIC investment options for retirement plans. (*Id*. ¶¶ 25–28.)

Mr. Payne alleges that the MassMutual general account GIC offered by the Plans consistently underperformed over a period of six years, when measured against other

comparable stable value funds. (*Id.* ¶¶ 27–29.) He specifically identifies two comparators: (1) the typical crediting rates offered by MassMutual for its separate account GICs over the same period, and (2) the crediting rate for a different entity's general account fixed-annuity contract over the same period. (*Id.*)

From the first calendar quarter of 2017 through the end of 2023, the Plans' MassMutual general account GIC's crediting rate ranged from 3.00% to 3.20%. (*Id.* ¶ 28.) Over that same period, comparable plans received consistently higher crediting rates from MassMutual for separate account GICs. (*Id.* ¶ 27.) MassMutual's typical crediting rate for its separate account GICs, from the start of 2017 through the end of 2023, ranged from 3.81% to 4.68%. (*Id.* ¶ 28.) Except for four calendar quarters for which no data is available, MassMutual's typical crediting rate for its separate account GICs exceeded its rate for the Plans' general account GIC in every calendar quarter over the relevant period, by a rate of 0.71% to 1.58%. (*Id.*)

Over that same period, the Plans' MassMutual general account GICs also underperformed when compared to the crediting rates of other general account fixed-annuity contracts. (*Id.* ¶ 29.) For example, from the start of 2017 through December of 2023, the crediting rates for the TIAA-CREF traditional general account annuity ranged from 4.25% to 7.00%. (*Id.*) The TIAA-CREF annuity crediting rate exceeded the crediting rate for the Plans' GIC in every calendar quarter over the relevant period, by a rate of 1.25% to 4.00%. (*Id.*)

## 2.    The Mutual Fund Share Classes

In addition to the stable value investment option, the Plans offer a number of mutual funds into which participants may direct their investments, including the DFA US Large Cap Value Fund ("DFA Fund") and the Harbor Capital Appreciation Fund ("Harbor Fund"). (Plan A Prospectus at 4; JEPST Plan Prospectus at 4.) Each mutual fund offers multiple share class options for individual investors or investment plans. (Compl. ¶ 35.) Since the investment portfolio and management of a mutual fund does not change across share classes, the sole difference between share classes is the cost of the shares. (*Id*. ¶¶ 35, 40.) Larger plans will typically qualify for less expensive share classes than smaller plans or individual investors, and large plans have more leverage to bargain and reduce costs further. (*Id*. ¶¶ 35–36.) In this case, the Plans are of a size that would typically qualify for less expensive share classes. (*Id*. ¶ 37.)

For every year from 2017 through 2021, Hormel selected an institutional share class of the DFA Fund with a net expense ratio ranging from 0.22% to 0.27%. (*Id*. ¶ 39.) In each of those years, the Plans likely could have qualified for a less expensive share class of the DFA Fund. (*Id*.) Moreover, for each year, the cost of the DFA Fund share class Hormel selected exceeded that of a less expensive available share class by between 0.08% and 0.14%. (*Id*.)

With respect to the Harbor Fund, from 2017 through 2021, Hormel selected an institutional share class with a net expense ratio ranging from 0.65% to 0.67%. (*Id*.) In each of those years, the Plans likely could have qualified for the Harbor Fund's less expensive

retirement share class. (*Id.*) For every year at issue, the Harbor Fund's retirement share class was 0.08% less expensive than the share class selected by Hormel. (*Id.*)

Mr. Payne alleges that even fractions of a percent increase in expense ratios can have a significant impact on the long-term performance of plan participants' investments, because returns, not lost to share class fees, can be reinvested in the mutual fund and grow over time. (*Id.* ¶ 38.)

## II.    PROCEDURAL POSTURE

Mr. Payne initiated this putative class action lawsuit on February 21, 2024, on behalf of himself and all persons who were participants or beneficiaries of the Plans during the relevant period. (Compl. ¶ 42.) He alleges that Hormel breached its duty of care, skill, prudence, and diligence under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 *et seq.*, by selecting the underperforming stable value investment option, and by retaining more expensive share classes in certain mutual funds when less expensive share classes were available.

Hormel moves to dismiss the Complaint under Federal Rule of Civil Procedure 12(b)(6), arguing that Mr. Payne fails to state a claim upon which relief can be granted. Hormel argues that Mr. Payne fails to plausibly allege a breach of fiduciary duty with respect to either the stable value investment option or the retention of more expensive mutual fund share classes, and that he fails to plausibly allege that the Board is a fiduciary within the meaning of ERISA. (Def. Mem. in Support [Doc. No. 13].)

## III.   ANALYSIS

### A.   Legal Standard

When considering a motion to dismiss for failure to state a claim under Rule 12(b)(6), the Court accepts the facts alleged in the complaint as true, reading the complaint "in the light most favorable to the plaintiff, [and] making all reasonable inferences of fact in the plaintiff's favor." *Glow in One Mini Golf, LLC v. Walz*, 37 F.4th 1365, 1370 (8th Cir. 2022). On a Rule 12(b)(6) motion, the Court "generally must ignore materials outside the pleadings, but it may consider some materials that are part of the public record or do not contradict the complaint, as well as materials that are necessarily embraced by the pleadings." *Id*. Materials embraced by the complaint include "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleadings." *Zean v. Fairview Health Services*, 858 F.3d 520, 526 (8th Cir. 2017).

To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The facts alleged must have enough specificity "to raise a right to relief above the speculative level." *Bell Atl. Corp.*, 550 U.S. at 555. The Court reads the complaint as a whole, "not parsed piece by piece to determine whether each allegation, in isolation, is plausible." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009). Evaluation of a complaint upon a motion to dismiss is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id*.

B.     **ERISA**

ERISA imposes two primary duties on plan fiduciaries: loyalty and prudence. *Meiners*, 898 F.3d at 822. "[A] fiduciary shall discharge his duties with respect to a plan solely in the interests of the participants and beneficiaries . . . with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1). To plausibly allege a claim of breach of fiduciary duty under ERISA, a plaintiff "must make a prima facie showing that a defendant acted as a fiduciary, breached his fiduciary duties, and thereby caused a loss to the plan." *Dormani v. Target Corp.*, 970 F.3d 910, 914 (8th Cir. 2020).

ERISA's duty of prudence imposes upon fiduciaries a continuing duty to "monitor investments and remove imprudent ones." *Hughes v. Northwestern University*, 595 U.S. 170, 175 (2022). It is not enough for a fiduciary to simply offer plan participants a menu of investment options, some of which may perform better than others. When a plaintiff plausibly identifies an imprudent investment option in a plan, that is sufficient to state a claim for a breach of fiduciary duty under ERISA. *Id*.

In the context of an ERISA claim for breach of the fiduciary duty of prudence, a plaintiff clears the pleading bar by alleging sufficient facts for the Court to reasonably infer that the process by which the fiduciary selected the challenged fund was flawed. *Matousek v. MidAmerican Energy Co.*, 51 F.4th 274, 278 (8th Cir. 2022). The Court must take into account the practical reality that ERISA plaintiffs "generally lack the inside information necessary to make out their claims in detail unless and until discovery commences," and

will not require plaintiffs to plead facts "which tend systemically to be in the sole possession of defendants" if the facts alleged are sufficient to demonstrate that the plaintiff "is not merely engaged in a fishing expedition." *Braden*, 588 F.3d at 598. The challenge for ERISA plaintiffs is to use the data available to them about the selected funds, and some circumstantial allegations about methods, "to show that a prudent fiduciary in like circumstances would have acted differently." *Meiners*, 898 F.3d at 822.

To show that a prudent fiduciary in like circumstances would have selected a different fund, based on the cost or performance of the challenged fund, "[t]he key to nudging an inference of imprudence from possible to plausible is providing a sound basis for comparison—a meaningful benchmark—not just alleging that costs are too high, or returns are too low." *Matousek*, 51 F.4th at 278 (quoting *Davis*, 960 F.3d at 484). "No authority requires a fiduciary to pick the best performing fund," and bare allegations that a less expensive or better performing alternative investment exists in the marketplace do not raise a plausible inference of imprudence. *Meiners*, 898 F.3d at 822–23. Whether a comparator fund serves as a meaningful benchmark by which to judge the cost or performance of a challenged investment rests on the totality of the specific allegations in a case. *Braden*, 588 F.3d at 596, 596 n.7.

## C.  The Stable Value Investment Option

Hormel argues that Mr. Payne's allegations regarding the MassMutual general account GIC investment option fail because he does not plausibly allege a meaningful benchmark against which to judge the investment's underperformance, and that the degree

9

and duration of that alleged underperformance is insufficient to plausibly infer a flawed fiduciary process.[2] The Court considers each argument in turn.

### 1. Eighth Circuit Law on Meaningful Benchmarks

The Eighth Circuit provided important guidance on what a plaintiff must plausibly allege to identify a meaningful benchmark in *Meiners v. Wells Fargo & Co.*, 898 F.3d at 821. In that case, a participant in Wells Fargo's employee retirement plan sued the company, alleging that retaining Wells Fargo's proprietary investment funds as options in its plan, and defaulting to those proprietary funds for plan participants who did not elect other options, was a breach of its fiduciary duties under ERISA. The plaintiff alleged that these Wells Fargo funds were more expensive than comparable Vanguard and Fidelity funds, and that they underperformed the Vanguard funds.

The Eighth Circuit, affirming the lower court's dismissal of the complaint, held that the plaintiff failed to state a plausible claim of imprudence, because the plaintiff failed to plausibly identify a meaningful benchmark against which to judge the cost and

---

[2]    Hormel also argues that Mr. Payne fails to allege that either the TIAA-CREF traditional annuity fund or any higher performing separate account GICs were actually available to the Plans. The Eighth Circuit, however, does not require a plaintiff to plead that a comparator is available to a plan to support an inference of imprudence. In *Matousek*, cited by Hormel, the Eighth Circuit found the plaintiffs' claims insufficient, not because the plaintiffs failed to allege that their comparators were available to the plan at issue, but because the plaintiffs did not plead facts sufficient to allege that their comparators were meaningful benchmarks. 51 F.4th at 280. Which investment options were available to the Plans is a question of fact. *See Hughes v. Northwestern University*, 63 F.4th 615, 630 (7th Cir. 2023) (holding that the availability of a prudent course of action is a fact issue inappropriate to resolve on a motion to dismiss); *Coppel v. SeaWorld Parks & Entertainment, Inc.*, No. 21-cv-1430, 2024 WL 3086702 (S.D. Cal. Jan. 31, 2024) (finding that whether the TIAA-CREF fund was available to the plan was a fact issue that could not be resolved at the pleading stage).

performance of the funds at issue. The court noted that the "fact that one fund with a different investment strategy ultimately performed better does not establish anything about whether the [challenged funds] were an imprudent choice at the outset." *Id*. at 823.

The *Meiners* court contrasted the allegations before it to those considered in *Braden*, a case in which the plaintiff alleged, as meaningful benchmarks, the market index and other shares of the same fund. *Id*. (discussing *Braden*, 588 F.3d at 595–96). It further noted that, in *Braden*, the court warned that its decision was based on the specific allegations before it, and that merely alleging the existence of a preferable alternative fund in the marketplace would be insufficient to state a claim. *Braden*, 588 F.3d at 596 n.7. The *Meiners* court underscored the fact that ERISA does not require fiduciaries to select the best performing fund.

In *Davis v. Washington University in St. Louis*, three employee retirement plan participants sued Washington University in St. Louis for breaching its fiduciary duties under ERISA, alleging in part that the university kept three underperforming investments in the plan for too long. 960 F.3d at 484. The district court dismissed the complaint, noting that the plaintiffs had failed to plausibly allege a meaningful benchmark against which to judge the performance of those investment options.

The Eighth Circuit agreed and affirmed the lower court's dismissal. The Court noted that, as to the first investment fund option, although both that option and the comparator were focused on real estate, it was evident from the documents embraced by the pleadings that the option in the plan was actively managed and purchased direct ownership stakes in income-producing real estate, whereas the comparator fund was set up to passively track

an index of stocks in publicly traded real estate trusts. Thus, the court found that the funds had "different aims, different risks, and different potential rewards," and comparing them was like "comparing apples and oranges." *Id*. at 485.

As to the second fund option, the court noted that the fund in the plan had 30% of its portfolio invested in international securities, offering investors broad exposure to both domestic and international stocks, while the alleged comparators had significantly lower percentages of international stocks. Thus, the court found that the funds were too different in composition to serve as meaningful benchmarks. *Id*. at 485–86.

The final investment at issue was a fixed-annuity contract. The court agreed that the plaintiffs failed to plausibly allege a meaningful benchmark, because they had not identified any other fixed-annuity contract that had performed better than the one at issue. *Id*. at 486–87.

In *Matousek v. MidAmerican Energy Co.*, the court considered an action brought by participants in an energy company's employee retirement plan, alleging in part that certain plan investment funds consistently underperformed. 51 F.4th at 280. The plaintiffs compared: (1) the performance of the funds at issue to the average performance of funds in their "peer groups"; (2) the expense ratios of those same funds to the expense ratios of funds in their "peer groups," and; (3) the performance of two of the funds at issue to alternative investments. *Id*. at 281.

First, the court noted that the plaintiffs had failed to adequately allege the similarities between funds in each "peer group." For instance, there were no allegations that the comparators in a "peer group" had similar risk profiles, return objectives, or

management approaches. With respect to the two less expensive, better performing alternative investments identified by the plaintiffs, the *Matousek* court noted that they too had different investment strategies, different risk profiles, and different potential rewards. Accordingly, the court found that the plaintiffs failed to adequately plead meaningful benchmarks for the funds at issue, and affirmed the lower court's dismissal of the complaint. *Id.* at 282.

Together, *Meiners*, *Davis*, and *Matousek* are instructive as to what investment comparators can function as a meaningful benchmark. Plaintiffs must not only identify less expensive or better performing investment options as comparators, but those alternative options must also be similar enough to raise a plausible inference that a prudent investor in like circumstances would not have selected the challenged investment. When determining whether a comparator is sufficiently similar to the fund at issue, courts may look to its structure, objectives, strategy, and risk profile. As the court repeatedly observed, however, this requirement is not intended to be such a barrier that plaintiffs cannot bring potentially meritorious ERISA claims. *See Matousek*, 51 F.4th at 281 (noting that there is no "one size fits all approach" to pleading a meaningful benchmark, and that trial courts should consider the totality of the specific allegations before dismissing a complaint).

## 2. The Plausibility of the Meaningful Benchmarks Pled for the General Account GIC

In this case, the investment option at issue is the MassMutual general account GIC—a stable value investment option. Stable value investment options, by nature, are different from other types of investment options typically offered in a retirement plan. They

are defined by their predictability, they offer a set return on investment, and their associated risk level is a creature of their structural design rather than their investment strategy. The Eighth Circuit has only once considered the plausibility of claims alleging imprudence in the selection or retention of a stable value investment. *See Davis*, 960 F.3d at 486 (noting that the complaint did not allege a single comparator for the fixed-annuity contract at issue).

However, a sister court in this circuit recently considered whether a similar claim involving a stable value investment option could survive a motion to dismiss. *See Lacross v. Jack Henry & Assocs., Inc.*, No. 23-cv-5088, 2024 WL 3564575 (W.D. Mo. July 11, 2024) (Bough, J.). In *Lacross*, the plaintiff sought to amend the complaint to add a claim alleging a breach of fiduciary duty under ERISA with respect to the plan's stable value fund investment option. The fund at issue was a general account GIC owned by Prudential. The plaintiff alleged that the GIC underperformed as compared to (1) the TIAA Traditional Annuity Fund and (2) the average crediting rates of MassMutual separate account GICs. The defendant argued that neither comparator was sufficiently similar to serve as a meaningful benchmark.

The *Lacross* court, guided by Eighth Circuit authority, rejected the defendant's arguments as to both comparators. With respect to the TIAA fund, the court observed that both the TIAA fund and the GIC at issue operate as fixed-annuity products. Even if unavailable to the plan, the court noted that the TIAA fund could still serve as a meaningful benchmark. As to the MassMutual separate account GICs, the court observed that, taking the facts alleged as true, "they only differ insofar as, being separate account GICs, they allegedly carry less risk. From the perspective of a plan participant or investor, they

14

allegedly provide the same benefit." *Id*. at *3. Consequently, the court found that the plaintiff had plausibly alleged that both the TIAA fund and the MassMutual separate account GICs were meaningful benchmarks.

Here, taking the facts as true and drawing all reasonable inferences in the plaintiff's favor, the Court finds that Mr. Payne has plausibly pled meaningful benchmarks against which to judge whether the MassMutual general account GIC underperformed. As to the TIAA-CREF fund, he alleges that this is a fixed-annuity general account investment like the MassMutual general account GIC, with the same structure, purpose, and risk profile. *See Meiners*, 898 F.3d at 822 (a plaintiff must provide "a sound basis for comparison"); *Lacross*, 2024 WL 3564575 at *3.

The Court further finds that the Plaintiff plausibly alleges that the MassMutual separate account GICs are a meaningful benchmark. Based on the pleadings and the documents embraced by the pleadings, these accounts are owned, operated, and managed by the same insurer. As stable value GICs, they share the same goal of offering investors an option that guarantees a return of their principal, in exchange for low crediting rates. While it is true, as Mr. Payne alleges, that general account GICs and separate account GICs have different risk profiles, they are sufficiently similar to serve as meaningful benchmarks. *See Disselkamp v. Norton Healthcare, Inc.*, No. 3:18-cv-48, 2019 WL 3536038, at *6 (W.D. Ky. Aug. 2, 2019) (discussing the evolution of various GIC structures and denying a motion to dismiss a claim comparing an allegedly underperforming general account GIC to the TIAA fund and separate account GICs). Unlike the comparators pleaded in *Matousek*, *Davis*, and *Meiners*—funds that were

managed by different investment companies with different objectives and portfolios—stable value GICs provide the same benefits and expectation of returns.

Here, a reasonable inference to draw is that "a prudent fiduciary in like circumstances would have selected a different fund." *Meiners*, 898 F.3d at 822. Taking the facts as true and drawing all reasonable inferences in Mr. Payne's favor, the Court finds that he has plausibly alleged that MassMutual's separate account GICs are also a meaningful benchmark.

### 3.   Duration and Degree of Underperformance

Hormel next argues that, even if Mr. Payne's alleged comparators were meaningful benchmarks, the duration of the GIC's underperformance is not long enough to plausibly plead a flawed fiduciary process. Hormel further argues that the underperformance of a stable value investment option should not give rise to an inference of imprudence, because stable value funds are designed to protect principal rather than chase returns.

In support of its position, Hormel relies on several out-of-circuit district court cases. In those cases, the courts found that a stable value fund's underperformance over a similar period was insufficient to support an inference of a breach of fiduciary duty. *See, e.g.*, *Lalonde v. Mass. Mutual Ins. Co.*, —F. Supp. 3d—, 2024 WL 1346027, at *9 (D. Mass. Mar. 29, 2024) (a fund's alleged underperformance when compared to a benchmark over a seven-year period is a "hindsight-based allegation" insufficient to support a plausible inference of a flawed process); *England v. DENSO Int'l Am., Inc.*, No. 22-cv-11129, 2023 WL 4851878, at *8–9 (E.D. Mich. July 28, 2023) (a "two-year snapshot of underperformance" is insufficient to plausibly plead a breach of fiduciary duty). The courts

in other out-of-circuit cases, however, have reached the opposite conclusion. *See, e.g.*, *Miller v. Autozone, Inc.*, No. 2:19-cv-2779, 2020 WL 6479564 (W.D. Tenn. Sept. 18, 2020) (observing that consistent underperformance of a stable value product over time supports an inference of imprudence); *Terraza v. Safeway, Inc.*, 241 F. Supp. 3d 1057, 1075–77 (N.D. Cal. 2017) (finding an allegation that a stable value fund underperformed when measured against a comparable option over a period of six years sufficient to survive a motion to dismiss).

In this case, Mr. Payne claims that Hormel breached its duty to monitor the Plans' investment options and remove imprudent ones, by failing to remove and replace the MassMutual general account GIC with a safer stable value option, or an option with a better crediting rate. In support, Mr. Payne alleges that the GIC at issue received a lower crediting rate than a comparable fund of the same structure over a period of six years. He alleges that a prudent fiduciary would have leveraged the size of the plan to either negotiate a better deal with MassMutual or to remove the underperforming option from the Plans and replace it with a safer or higher performing one.

Moreover, it is alleged that the general account GIC chronically provided lower crediting rates than the *safer* separate account GICs offered by the same insurer. (Compl. ¶¶ 27–28.) Further, unlike other types of investments, stable value funds are intended to perform consistently over time. Drawing all reasonable inferences in favor of Mr. Payne, the Court finds it plausible that a prudent fiduciary in the circumstances alleged "would have acted differently," *Meiners*, 898 F.3d at 822, and denies the motion to dismiss on this basis.

17

**D.      The Mutual Fund Share Classes**

Hormel argues that the Court should dismiss Mr. Payne's claims regarding the Plans' mutual fund share classes, because he has not sufficiently alleged that the alternative share classes he identifies were available to the Plans or were less expensive on net than the share classes offered by the Plans. To support these arguments, Hormel largely relies on documents, outside of the pleadings, that it claims are embraced by the Complaint. The Court first addresses what materials it may consider and then turns to the sufficiency of Mr. Payne's allegations.

**1.      Materials Embraced by the Pleadings**

This Court recently addressed what materials it may consider at the pleadings stage in the context of an ERISA putative class action. *See Parmer v. Land O'Lakes, Inc.*, 518 F. Supp. 3d 1293 (D. Minn. 2021) (Doty, J.). In *Parmer*, the Court reasoned that publicly available fund prospectuses and Form 5500 reports for the plans at issue were documents necessarily embraced by the complaint. *Id*. at 1302 (citing *Meiners*, 898 F.3d at 823). The defendants in *Parmer* attached other documents, however, including certain disclosures made by service providers to the plan's fiduciaries pursuant to ERISA § 408(b)(2) (*see* 29 U.S.C. § 1108(b)(2)(iii)). The defendants' purpose in submitting these disclosures, not previously available to plan participants, was to dispute the truth of facts alleged in the complaint. Because these disclosures raised factual disputes inappropriate for resolution at the pleadings stage, the Court ruled that it was improper to consider them. *Id*. at 1302, n.5.

Hormel asks the Court to consider the Plan A and JEPST Plan Form 5500 reports, obtained from the Department of Labor's website, and the publicly filed prospectuses for

the DFA Fund and the Harbor Fund, obtained from the U.S. Securities and Exchange Commission's website [Doc. No. 14], to which Mr. Payne does not object. As part of the public record and necessarily embraced by the Complaint, the Court considers these documents for the purpose of evaluating the sufficiency of Mr. Payne's pleadings with respect to the mutual fund share claims.

Hormel also asks the Court to consider certain fee disclosure documents shared by service providers with the Plans' fiduciaries pursuant to ERISA § 408(b)(2) [Doc. No. 17]. Mr. Payne objects to the Court's consideration of these documents, noting that they are not cited or referred to in the Complaint. Further, both documents clearly state that they are "for sponsor use only" and are "not intended for distribution to plan participants" [Doc. No. 17 at 113–132]. Hormel cites to these documents to dispute the facts alleged—to argue that, despite the data alleged in the Complaint, the Harbor Fund's share class was less expensive on net than the alternative fund identified, after accounting for revenue sharing. The Court finds that since these documents, previously unavailable to Mr. Payne, are being introduced to dispute the truth of the facts alleged, they are clearly not embraced by the pleadings, and it would be inappropriate for the Court to consider them at the pleadings stage of the case. *See Parmer*, 518 F. Supp. 3d at 1302.

Finally, Hormel asks the Court to consider a 2016 Investment Change Brochure [Doc. No. 17] (referred to by Hormel as a "2016 Plan Comm'n"), which was distributed to plan participants. The Court finds that this communication, which predates the relevant period alleged in the Complaint by two years, is also not "necessarily embraced by the pleadings." Like the § 408(b)(2) disclosures, Hormel submits this document to dispute the

19

factual allegation that the Harbor Fund share classes in the Plans were more expensive than the alternative ones alleged by Mr. Payne. The Court again finds it inappropriate for the Court to consider this disputed evidence at this stage of the proceedings.

### 2.     Sufficiency of the Complaint

The Court now turns to the allegations in the Complaint itself. Mr. Payne alleges: (1) that the Plans have a large pool of assets; (2) that the size of the Plans enables them to obtain or negotiate for cheaper share classes of mutual funds; (3) that the Plans selected share classes which were more expensive than others available from the same funds, and; (4) that because there is no difference between share classes of the same mutual fund other than price, a prudent fiduciary should always select the least expensive share class available.

The Eighth Circuit has consistently found similar allegations sufficient to state a claim for breach of fiduciary duty. For example, in *Davis*, the complaint alleged that retirement plans exist in a competitive marketplace, that the plan at issue had a large pool of assets enabling it to negotiate for institutional class shares of a certain fund, and that, nevertheless, the plan offered participants more expensive retail shares of the same fund. 960 F.3d at 483. The Eighth Circuit found that these facts gave rise to at least two plausible inferences of mismanagement: one, that the defendants did not negotiate aggressively enough; or two, that the defendants were "asleep at the wheel" and failed to recognize the availability of lower cost alternatives. Thus, the facts alleged were sufficient to survive a motion to dismiss, and the Eighth Circuit reversed the district court's dismissal of the mutual fund shares claim. *Id*. at 483–84, 487.

Similarly, the complaint in *Braden* alleged that the plan had a large pool of assets, the leverage to negotiate for institutional class shares of mutual funds, and that, nevertheless, the plan offered only more expensive retail class shares to participants. 588 F.3d at 595. The Eighth Circuit found that these facts gave rise to the reasonable inference that the process by which the funds were selected and managed was tainted by a failure of effort, competence, or loyalty. *Id*. Accordingly, the court held that the complaint plausibly stated a claim for breach of fiduciary duty, and reversed the dismissal below. *Id*. at 595–96.

The facts alleged in this case are strikingly similar to the allegations considered by the *Davis* and *Braden* courts. Nevertheless, Hormel argues that this case is different because Mr. Payne failed to allege that the Plans could have obtained the alternative DFA Fund share classes.

Hormel's argument relies on its observation that, according to the DFA Fund's prospectuses, the alternative share class is only available to institutional plans with the approval of the DFA Fund Advisor. While this may or may not be true, it may also be true for *both* share classes at issue. The 2021 prospectus summary for both funds state that "[a]ll investments are subject to approval of the Advisor" [Doc. No. 17 at 82, 93]. Neither the pleadings, nor any documents embraced by them, shed further light on the approval process involved. Accordingly, whether the Plans were foreclosed from approval for the cheaper fund is a factual dispute, inappropriate for resolution at the pleadings stage.

Hormel also argues that there can be no plausible inference of imprudence because the Harbor Fund's institutional share classes were less expensive on net than the retirement

share classes, after accounting for revenue sharing. This argument, however, relies on

materials not embraced by the pleadings, which the Court cannot consider. Mr. Payne has

alleged that the retirement share classes were less expensive than the investor share classes,

and that selecting the more expensive share class did not provide any discernable benefit

to participants of the Plans. Taking the facts as true and drawing all reasonable inferences

in the plaintiff's favor, the Court finds that he has plausibly alleged a breach of fiduciary

duty with respect to the Harbor Fund share classes.

On this basis, the Court finds that the Plaintiff has plausibly alleged that the

Defendants' fiduciary process with respect to the Plans was flawed in these respects.

Accordingly, the motion to dismiss on this basis is denied.

### E.    Fiduciary Status of the Board

Under ERISA,

> [A] person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(A).

Fiduciary status under ERISA is 'not an all or nothing concept." *McCaffree*

*Financial Corp. v. Principal Life Ins. Co.*, 811 F.3d 998, 1002 (8th Cir. 2016). Courts must

ask "whether a person was acting as a fiduciary when taking the action subject to the

complaint." *Id*. In other words, there must be a "nexus" between the alleged fiduciary duty and the wrongdoing alleged in the complaint. *Id*.

In this case, Mr. Payne alleges that the Board "consists of persons authorized or otherwise entrusted to make discretionary decisions with regard to the Plans' investments," and that at all times relevant to the Complaint, the Board "had discretion to select or reject the Plans' investments." (Compl. ¶¶ 9–10.) Hormel argues, in response, that these allegations are not sufficiently specific to plausibly allege that the Board acted as a fiduciary in this case. However, as several courts have held, the role of corporate officers and directors with regard to the internal decisions of a company is the type of fact that tends to be in the sole possession of a defendant. *See Placht v. Argent Trust Co.*, No. 21-cv-5783, 2022 WL 3226809, at *7 (N.D. Ill. Aug. 10, 2022) (citing cases); *Braden*, 588 F.3d at 598 (courts "must take account" of plaintiffs' "limited access to crucial information"); *In re Polaroid ERISA Litig.*, 362 F. Supp. 2d 461, 473 (S.D.N.Y. 2005) (finding that an assertion "echoing the ERISA definition" is sufficient at the pleading stage, even against some contradictory plan documents, to allow discovery to proceed).

Hormel cites to excerpts from two "official plan documents" (one for each of the Plans) [Doc. No. 17 at 5–25], which purport to establish that the Board does not act as a fiduciary for the Plans. These documents, which are not provided to plan participants, are presented for the purpose of contradicting the truth of the factual allegations in the Complaint. Further, they clearly state that they are "working copies" which have "not been approved, ratified or executed by the company, its board, its officers or any committee," and accordingly are "not, therefore, an official legal document under which the Plan is

maintained" [Doc. No. 17 at 5, 16]. The Court finds that, for all these reasons, these documents are not appropriately considered at this stage of the proceedings.

Accordingly, taking the facts as true and drawing all reasonable inferences in the plaintiff's favor, the Court finds that Mr. Payne has plausibly alleged that the Board acted as a fiduciary during the relevant period.

## IV.   ORDER

Based on the submissions and the entire file and proceedings herein, **IT IS HEREBY ORDERED** that the Defendants' Motion to Dismiss [Doc. No. 10] is **DENIED**.

**IT IS SO ORDERED.**

Dated: September 18, 2024                    /s/ Susan Richard Nelson
                                             SUSAN RICHARD NELSON
                                             United States District Judge